In the Matter of ROY M. COHN, an Attorney, Respondent. DEPARTMENTAL DISCIPLINARY COMMITTEE FOR THE FIRST JUDICIAL DEPARTMENT, Petitioner.

First Department, June 23, 1986

16

**APPEARANCES OF COUNSEL**

*Michael B. Mukasey* and *Harold R. Tyler, Jr.,* of counsel *(Patterson, Belknap, Webb & Tyler,* attorneys), for respondent.

*Sarah Diane McShea* and *Howard Benjamin* of counsel *(Michael A. Gentile,* attorney), for petitioner.

**OPINION OF THE COURT**

Per Curiam.

Respondent Roy M. Cohn was admitted to practice law in New York State by this judicial department in 1948. Throughout the period relevant to these proceedings, he has maintained an office within this judicial department.

In the fall of 1982, respondent was charged with professional misconduct and conduct prejudicial to the administration of justice with regard to four separate matters arising over the previous 16 years. Simply stated, the four charges involved alleged dishonesty, fraud, deceit and misrepresentation in connection with (1) an application for admission to the Bar of a foreign jurisdiction, (2) the failure to repay a loan to a client, (3) the procuring of a codicil to a will from an individual who was allegedly incompetent to execute knowingly such an instrument, and (4) the violation of an escrow order.

Our decision today represents the culmination of more than three years of intensive proceedings, involving the taking of thousands of pages of testimony and documentary evidence, the review of proceedings in other courts, and the issuance of no fewer than five prior orders of this court. After a thorough review of the record, we have come to the conclusion that all

four charges should be sustained (notwithstanding the Hearing Panel's recommendation of exoneration on one of the charges), and that respondent should be disbarred.

### CHARGE II—THE SCHLESINGER OBLIGATION

In 1965 respondent's law firm, Saxe Bacon & Bolan, was retained by Iva Schlesinger, who was in the midst of the settlement of a divorce from her wealthy South African husband. Respondent and his partner, Thomas A. Bolan, rendered $60,000 worth of legal services, which respondent acknowledged in writing to be the full amount due. This fee was paid in full, in a timely fashion, by Mrs. Schlesinger's husband. Four months after the divorce, respondent met Mrs. Schlesinger in Paris and asked her for $100,000. According to Mrs. Schlesinger, she initially asked for collateral, but when respondent objected to this formality, she gave him the money without security. She testified that the check was actually made out by respondent on her account at a United States bank, and all she had to do was sign the check. The face of the check contained the notation "loan", in respondent's handwriting. Respondent additionally gave Mrs. Schlesinger a written acknowledgement of this "90 day renewable loan of $100,000, at 8% interest per annum". When this note was subsequently lost, respondent replaced it, at Mrs. Schlesinger's request, with a $100,000 promissory note, dated January 3, 1967, payable and renewable in 90 days. For the next 17 years, despite many requests to do so, respondent failed to pay off this debt. A number of partial payments were made, in response to Mrs. Schlesinger's pleas, but the obligation was never entirely satisfied until 1984, when respondent caused his firm to pay her $100,000 in settlement of a $127,584.76 judgment. This, however, was only after the onset of these disciplinary proceedings. During the interim, the evidence paints a picture of a creditor increasingly frustrated in her attempts to obtain satisfaction of this 90-day obligation.

After years of pleading and cajoling for repayment of this money, interspersed with written assurances, acknowledgements and even partial payments from respondent, Mrs. Schlesinger finally sued respondent for the balance in Supreme Court, New York County. In 1979, in an affidavit in opposition to Mrs. Schlesinger's summary judgment motion in that action, respondent raised for the first time the notion that the financial transaction between the parties was not a

loan, but rather a "$100,000 advance" against the performance of future legal services. During the seven years since then, respondent has scrupulously avoided any reference to the transaction as a "loan". This, of course, represents a complete shift of gears, ignoring a voluminous record of documented references to this transaction as a loan. For example, there is:

—the check itself, advancing the funds on October 7, 1966, filled out in respondent's handwriting with the clear notation "LOAN" on its face. The check was personally indorsed by respondent to the order of a third party, evidently in satisfaction of a personal obligation.

—the contemporaneous letter, handwritten by respondent on his personal stationery, in which he acknowledges: "You have made me a 90 day renewable loan of $100,000, at 8% per annum, for which I have given you a note."

—the note, signed by respondent on January 3, 1967, stating the amount ($100,000) and the terms (90 days, renewable, at 8%).

—a letter from respondent to Mrs. Schlesinger on April 12, 1967 in which he enclosed a check for $2,000 and referred to "the money you loaned me at 8% interest * * * due this month * * * Please let me know if you need the principal. If you do not, and wish to leave it out at 8% for a year or some lesser period, this is agreeable. On the other hand, if you wish me to start reducing the loan on a monthly basis right now, with the balance at 8%, this is also agreeable."

—Mrs. Schlesinger's letter from Switzerland, dated May 12, 1967, responding: "Yes Roy, I want back the unsecured loan of $100,000, that you borrowed from me, which constituted 10% of my entire capital. With interest to date. Will you please deposit it in the Bankers Trust Co. Lincoln Center Branch."

—respondent's letter to Mrs. Schlesinger, dated May 22, 1967: "On the loan, I am paying interest to you for every day I have it—but despite that, I do appreciate your having accommodated me, and always will." Respondent goes on to emphasize what a bargain Mrs. Schlesinger got in legal services ("The fee was totally inadequate based on the effort and result—but we took what they would give because we wanted the deal to go through for you"), and also complains about stories being spread by some woman that "you said you loaned me money".

—respondent's handwritten letter to Mrs. Schlesinger, on

his personal stationery, dated June 22, 1967, stating in its entirety: "Confirming our conversation this morning, the $100,000 loan you made to me will be liquidated in full by October 10, 1967—one year from its original date. In the meantime I will reduce it as much as possible. I today have given you my check for $5,000. in reduction, and will make monthly reductions until October. I am giving you today an interest check dated July 10, 1967—$2,000—computed at 8% per annum. Until the loan is repaid in full, I shall cause you to be made a beneficiary for $100,000. of an insurance policy on my life I now carry, and will confirm this to you in writing as soon as accomplished." (This was never confirmed in writing, and there is no evidence that a beneficial interest in respondent's life insurance was ever conferred on Mrs. Schlesinger.)

—respondent's brief letter to Mrs. Schlesinger in Switzerland, dated August 1, 1967, which includes the sentence "I also enclose another check for $5,000. in further reduction of the loan."

—another letter to Mrs. Schlesinger, dated September 20, 1967, in which respondent says "I intend to send another reduction payment on the loan very shortly."

—a responding letter from Mrs. Schlesinger in Switzerland to respondent, dated September 27, 1967, which reads in part: "You mention a reduction Payment on the loan. I have a letter from you Roy saying that on the date, I shall have FULL payment + interest. During this year, I could have doubled that money, with the Stock Market the way it is. You were my friend and required a loan and I obliged. Now, I am going into a business and I need it. Urgently. I told you that I'm going on a little trip to Paris and London starting the 1st October. Perhaps I might miss you, if you do travel, so I suggest that you deposit the money for me, In the Bankers Trust, at the Lincoln Square Branch."

—a letter from Mrs. Schlesinger to respondent, dated October 21, 1967: "On October 10th, 1966, over a year ago, when you were in Paris on a trip and I came there to meet you, you asked me to lend you $100,000. without collateral, at 8%. As you were my friend, and I had just received my Divorce Settlement, I did so without any fuss, lend you the $100,000. for the Three months that you requested and you gave me your note. A lot longer than 3 months has passed. You wrote me a letter, in your own hand, saying that I shall have the

full amount of the loan, still owing, repaid to me by the 10th of October, of this year. You have not fulfilled your obligation to me. Either as my friend or my lawyer. In a Registered letter I asked you to <u>Please</u> deposit the amount of money still owing to me, into the Bankers Trust Co. at the Lincoln Square Branch. I have received no word from them or from you! You told me last June, that the money was invested, and that you were not prepared to sell anything. If the $88,400. plus interest * * * is not paid into my account, at the aforementioned Bank, within four days of your receiving this letter, I want full participation in the profits you have made from your holdings in Austin, Nicols * * * I have repeatedly telephoned and written to you, without success, to finally resolve this matter and for me to have my money back. I am sure that you don't want to force me into doing something, that will make the both of us unhappy."

—a draft signed by respondent to Mrs. Schlesinger's order, dated June 13, 1968, promising the payment of $20,000 on the University National Bank in Chicago on July 1. (Although presented for payment to Bankers Trust Company in New York, this draft was not paid.)

—a personal check from respondent to Mrs. Schlesinger, dated July 1, 1968 in the amount of $20,000, drawn on University National Bank in Chicago. The indorsement indicates deposit in the payee's bank on July 2; it, too, did not clear; a subsequent stamp indicates cancellation of indorsement on July 10.

—a letter from Mrs. Schlesinger to respondent, dated July 10, 1968, enclosing an article about respondent from the Paris edition of the *Herald Tribune,* and adding: "You seem to have time to have written a book, do your law practice, be a business man and man about town, and move your office, and be on your new yacht but not to have enough time to pay me back the money you owe me. I have heard from my bank, that the note for the $20,000. on the University National Bank of Chicago, has been defaulted upon. The check for $20,000. is also in question, and I'm waiting to hear about that. What kind of man are you??? I should think that there are a lot of names for it! By the 31st of this month I expect ALL of the money owning *[sic]* to me including principal, and interest, to date, be paid into the Bankers Trust Co. Lincoln Center Branch, to my account. You have done a lot of talking, and I was stupid enough to listen. I await be paid."

—a letter to Mrs. Schlesinger from respondent, on his New York law firm's stationery, dated July 24, 1968: "Your letter received. Apparently the bank presented the material *before* July 1, when it had not been covered and was returned. I had asked that it not be done this way. I shall arrange for the check to be deposited to your account here as you request, when I return from the Coast."

—a telex from respondent to Mrs. Schlesinger, dated August 24, 1968: "sending check for 10000 stop balance shortly".

—a letter from Mrs. Schlesinger to respondent, dated September 22, 1968, indicating receipt of the latter's cable and her "assum[ption] that the $10,000. was deposited into my Bankers Trust account * * * I will be coming back to New York this winter for a while and we must finally resolve the matter of the money that you owe me. The 3 month loan has become one of over two years."

—a telex from respondent to Mrs. Schlesinger, dated October 4, 1968: "received your letter and cable most anxious to clear up matter particularly in view of your need substantial fees due since i first spoke to you and wanted to make further payments are slow but i am trying to make special arrangements and will advise you".

—a personal letter from respondent to Mrs. Schlesinger, dated December 20, 1968: "Just a note to say that despite my problems (which I hope will be over soon), which have made banking next to impossible as you can now understand—I am working something out, and will be able to start payments of principal and interest shortly. Thanks for your patience".

—a promissory note signed by respondent to Mrs. Schlesinger's order, dated April 11, 1969, in the amount of $62,449.96. (Although payment on this note was subsequently demanded, the note was not honored.)

—an undated letter from Mrs. Schlesinger in London to respondent in New York, with the registration receipt stamped November 15, 1972, verbatim as follows: "Another of my trips to America is over and another year has just about gone by. While I was in New York my numerous 'phone calls to you went unanswered until you called just as I was leaving for the airport after being in New York for one month, and I do not appreciate being 'hung up' on. You have so vacillated over repaying your debt to me that it has made me ill. My patience has at long last worn thin. You know you owe me at least $100,000 and I think it most dishonourable for a lawyer to

have borrowed money from a client over six years ago and not have repaid her after repeated requests. I am not prepared to accept the small sums you mentioned. Even those have not been forthcoming in the two weeks since I left New York and you know my banks, both here in England and in Switzerland. Nothing less than $50,000 immediately and $50,000 by the 31st December this year will suit me. If this is not forthcoming I really do not see how I can avoid seeking legal advice on this matter. I am sure neither of us would relish that."

—a letter to Mrs. Schlesinger at her New York address, from respondent on his law firm stationery, dated November 13, 1973: "Enclosed check. We are treating it as half interest, half principal." Respondent alludes to an unpleasant telephone conversation with Mrs. Schlesinger, and reminds her that the firm took her case "without any retainer or disbursement money or anything other than a wing and a prayer". Respondent continues: "We realize you need some money now and will try to keep some checks coming." Enclosed with this letter was a check drawn to Mrs. Schlesinger's order by a third party, in the amount of $1,000.

—a check for $1,000, drawn on the Saxe Bacon & Bolan account, dated April 26, 1977, payable to Mrs. Schlesinger, for "reduction of loan—SB&B & RMC".

As can be seen, a simple review of the 10½ year correspondence between respondent and Mrs. Schlesinger leads to the inevitable conclusion that neither party considered the transaction between them to be anything but a loan, with no other conditions attached. Frustrated at her inability to obtain satisfaction on repayment of the loan, Mrs. Schlesinger retained an attorney and sued for recovery of this debt in 1978. It must be noted that Mrs. Schlesinger did not commence this action until after completion of an estate matter which respondent was handling for her, involving an underpayment of estate taxes to the Internal Revenue Service. Nothing in the correspondence between Mrs. Schlesinger and respondent, set forth above, indicates any intention by these parties to consider the loan as an advance or setoff against respondent's fee for work on the estate matter, which was independently paid.

Nevertheless, in 1979 respondent submitted an affidavit in response to Mrs. Schlesinger's motion for summary judgment in the amount of $60,075, in which respondent asserted for the first time that there were unfulfilled conditions attached to his obligation to repay the "$100,000 advance", namely,

that repayment was to be contingent on his failure to provide at least $100,000 worth of additional legal services in the future. Respondent averred that not only had he provided legal services in such an amount since Mrs. Schlesinger's 1966 divorce settlement, but since he had paid Mrs. Schlesinger at least $40,000 over the ensuing decade, he was entitled to counterclaim for recovery from her in that amount. Respondent's affidavit goes into explicit detail as to his version of an agreement between the parties concerning this advance. For example, respondent says that shortly after the divorce settlement, he and Mrs. Schlesinger had a discussion concerning his fee. In view of the fact that the fee paid by her husband was "totally unrealistic" in light of the time and effort put in by respondent's firm, and in view of the inevitability of "continuing legal services [to be] rendered by me and my firm in connection with the administration of the divorce settlement trusts * * * and in connection with other personal matters involving her and her family," it was agreed that Mrs. Schlesinger would advance to respondent "an additional $100,000" in exchange for "a note to secure her against any failure on my part to render legal services in connection with said matters."

The record before us is devoid of any documentary evidence of this purported agreement. We find it incredible that such an agreement would not have been memorialized in writing. Instead, the record of 10½ years of correspondence contradicts this version of the transaction between the parties. Respondent's explanation for all of his partial payments to Mrs. Schlesinger until April 1977 is that under the purported agreement, he had an option to satisfy his obligation under the advance with either repayments or the rendering of legal services. Again, the litany of documentary exchanges between the parties disproves the existence of such an option.

On January 8, 1981, respondent was deposed by Mrs. Schlesinger's attorney in the lawsuit. Respondent reiterated that Mrs. Schlesinger "gave" him the $100,000 as part of a "loose arrangement" to compensate for his firm's work on the divorce settlement, as well as for future considerations. As respondent put it, Mrs. Schlesinger was obligated to him for such additional compensation, at least "in a moral sense". As to how the figure of $100,000 was agreed upon, respondent could not recall, other than that it was a "loose" arrangement in light of the fact that Mrs. Schlesinger and her children had realized about $3 million as a result of the settlement. Respon-

dent testified that over a 20-year period of practice by his firm, it was "not our practice" to render bills or statements for services rendered, so there would be no documentary memorial of the basis for the $100,000 transaction. This, of course, is contradicted by respondent's handwritten letter to Mrs. Schlesinger on June 14, 1966, on the stationery of a Paris hotel:

"Dear Iva—

"On payment of $60,000 U.S. by Mr. Schlesinger on June 23, 1966 after the divorce, we will have been paid in full in your behalf for all fees and expenses, including your trip and Jennifer's.

"/s/ Saxe Bacon & Bolan
"by Roy Cohn".

Respondent revealed that the firm not only did not render written bills or statements, but it also did not maintain written evidence of retainer. Acknowledging that he had the authority to obligate the firm to perform services for a client, respondent testified that the firm had "no formal procedure" for evidencing such an undertaking by the firm. "If we're going to represent somebody * * * we just do it."

The most startling revelation in this deposition was when respondent was asked by Mrs. Schlesinger's counsel whether the $100,000 transaction could correctly be characterized as a loan. Notwithstanding respondent's numerous references to this matter as a loan, in his own handwriting between October 7, 1966 and April 26, 1977, he responded to this question at deposition: "I would say that's an incorrect characterization."

As to financial transactions "made between the attorney and his client, subsequent to the employment which are beneficial to the attorney, it is incumbent upon the latter to show that the provisions are fair and reasonable, and were fully known and understood by the client." *(Matter of Howell, 215 NY 466, 472.)* Respondent has failed to sustain this burden. We find it incomprehensible that neither respondent's version of the transaction nor his claim of legal services rendered for Mrs. Schlesinger has any documentary memorial in the record. On the contrary, the record clearly reveals a loan, in the words of both parties, and such a relationship between attorney and client is frowned upon *(see, Matter of Plewniak,* 91 AD2d 285). A fortiori, failure to repay a personal

loan is an act of moral turpitude constituting professional misconduct *(Matter of Hodes,* 97 AD2d 308, 311, *lv denied* 61 NY2d 983; *see also, Matter of Riccio,* 75 AD2d 687). Respondent's issuance of a subsequently dishonored check in payment of this loan was further evidence of professional misconduct *(Matter of Guttmann,* 54 AD2d 70), even if the transaction had been totally unrelated to his law practice *(Matter of Hodes,* 97 AD2d, at p 312).

In conclusion, we sustain charge II for three reasons: First, it was unethical, at the very least, to engage in such a transaction with a client. Second, it was unprofessional to engage in any financial transaction with a client without memorializing in writing the terms and consideration purportedly at variance with the written evidence already in the record. Third, we find that after 10½ years of declaring and acknowledging the transaction to be a loan, respondent's disavowal of such characterization of the transaction, under oath in legal proceedings before the Supreme Court, was untruthful.

### CHARGE IV—THE PIED PIPER ESCROW

In December 1971, respondent's firm took on the representation of Pied Piper Yacht Charters Corporation and Industrial Gear Manufacturing Company, and their president and chairman, Fred A. Coda, in a securities fraud action instituted by the Securities and Exchange Commission in the United States District Court for the Southern District of New York.[1] When a Judge of that court issued an order freezing corporate assets in order to protect the corporation's public investors, respondent negotiated an escrow agreement with the SEC in order to obtain the release of funds for payroll purposes. The agreement so negotiated became incorporated in an order of the court. In essence, the order provided for the corporation to place into escrow the sum of $25,000 plus two yachts, the *Pied Piper* and the *Defiance.* The latter vessel was not to be sold, transferred, hypothecated, pledged or otherwise disposed of. The former vessel could be disposed of only if it were replaced in the escrow with $94,000 of the proceeds of such a sale. The company would additionally maintain a $100,000 all-risk marine insurance policy on the *Defiance,* in excess of all encumbrances, and respondent's law firm would serve as escrow

---

1. See *Securities & Exch. Commn. v Pied Piper Yacht Charters Corp.,* Fed Sec L Rep (CCH) ¶ 94,918 (SDNY Dec. 18, 1974).

agent for these assets. The final paragraph of the agreement provided for the ownership and registry papers for the yachts to be delivered to respondent's firm, together with the "aforesaid monies, or an equivalent bond", all to be placed in an interest-bearing account for the benefit of the company's public investors. According to the SEC attorney, the "equivalent bond" language was negotiated into the agreement at respondent's behest.

The *Pied Piper* was subsequently sold, and $94,000 was delivered to respondent's firm for deposit to the escrow.

The freezing of assets had taken place on December 8, 1971. Respondent's firm was retained the next day, at which time respondent appeared in court and negotiated the terms of the escrow agreement, which was incorporated in the order of the court on December 10. On that date, respondent left the country for a vacation, returning on January 2, 1972. Shortly after his return, a major portion of the escrow was dissipated through the occurrence of a bizarre series of events. Responsibility for this loss in having permitted the dissipation of this portion of the escrow, and the misapplication of funds for purposes which were contrary to the intention of the escrow agreement and order, form the basis of this charge.

On January 12, 1972, the managing attorney in respondent's firm, one Melvyn Rubin, held $94,000 in cash and two $12,500 bonds in the firm's escrow account. On that date Rubin was handed a bond by a young attorney in the firm named Scott Manley, who had been assigned to this case. Manley, a year and a half out of law school and not admitted to practice in New York or in the United States District Court, had 11 days earlier been made a partner in respondent's firm. According to respondent, young Manley, who generally handled the firm's SEC matters, had close contact with Mr. Coda as a secretarial officer of some of that client's companies. Rubin testified that the bond handed to him was described by Manley as an "equivalent bond" in the sum of $120,000. It is now undisputed that this was not an equivalent bond. In fact, it was not even a surety bond. Rather, it was an indemnity bond insuring against loss to the corporate client by fraudulent action of respondent's other client, Coda,[2] the president of the corporation. Nevertheless, Rubin accepted

---

2. The opening paragraph of the bond prominently stated its purpose as insuring against loss "through any fraudulent or dishonest act or acts committed by Fred A. Coda".

this bond and immediately notified the SEC by telephone that he had what he believed to be an equivalent bond valued at $120,000, which he wished to substitute for the $119,000 in assets consisting of the two $12,500 bonds and the $94,000 cash proceeds from the sale of the *Pied Piper*. When the SEC attorney condoned such substitution on condition that this was indeed an equivalent bond, Rubin instructed another junior attorney in the office to prepare a cover letter and deliver the bond to the SEC the next day. On January 13 this bond was delivered to the SEC, whose counsel, treating the matter with grossly short shrift, initialed his indorsement of approval of the substitution on the firm's letter without realizing that this was not in fact an equivalent bond. The following day, January 14, 1972, Coda telephoned Rubin and asked for return of the $94,000 cash. Even though he had never met or spoken to Coda before, Rubin testified that he immediately removed the $94,000 cash from his escrow account and sent it to this client without consulting anyone else at the firm. The bond subsequently lapsed, revealing its worthlessness as a substitute for escrowed assets. The $94,000 was never recovered from Coda, who died nine years later.

Even though respondent was on the scene during all of these maneuvers with regard to the substitution of the purportedly equivalent bond and the release of the $94,000 in cash,[3] respondent's position, in the contempt proceedings in the Southern District and in the proceedings herein, has been that he had no direct knowledge of what was taking place. Respondent acknowledged that while he bore ultimate responsibility as a senior partner in the firm, he left the day-to-day management of this case to Manley. It was Manley who "handled a series of court appearances" in this action, "was in frequent telephone contact with his counterparts at the SEC," and generally "handled Pied Piper's corporate work". After Manley left the firm, he dropped out of sight in Texas and was unavailable to testify as to his involvement in this matter. Rubin, on the other hand, testified that he briefed respondent only perfunctorily on the escrow substitution, in the course of periodic routine reports on the status of pending cases, and that respondent did not press him on the details. Indeed, respondent testified that he never even read the purportedly "equivalent" bond, because he had no occasion to do so, had

3. The two $12,500 bonds also disappeared at around the same time, Rubin being unable to account for them.

no expertise in insurance matters, and didn't even think he would have understood it if he had read it.

We find these assertions to be incredible. Here was a case in which respondent's firm had literally jumped into the breach and, thanks to respondent's personal efforts, had rescued the corporate assets from the judicial "deep freeze", causing them to be entrusted to the more familiar surroundings of the firm's own escrow account, under conditions personally negotiated by respondent, including the provision—in respondent's own terms—for the substitution of an "equivalent bond". Little took place over the next few weeks, while respondent was away on vacation, but barely five weeks after respondent's personal intervention in this case, and fully 10 days after respondent had returned to work, a purportedly equivalent bond, which respondent says he wouldn't have recognized as such even if he had read it, was substituted for valued assets in the escrow. We are asked to believe that respondent had by now divested himself of all authority over this case, in favor of a young attorney, just admitted as a partner to the firm, who also happened to have a personal interest in the management of the corporate client. No specifics on the efforts in this case on the part of this supposed expert in SEC practice are evident from the record, other than his proffering to the firm's managing attorney a purportedly equivalent bond which turned out not to meet the requirements of the court's escrow order. The managing attorney turned right around and had this policy displayed to the SEC attorney as an equivalent bond, relying entirely on Manley's say-so. All of this took place right under the nose of respondent, who asks us to believe that he not only knew nothing of these events, but would have deferred anyway to Manley's expertise.

In addition to trying to hide behind Messrs. Manley and Rubin, respondent, never contesting that the $120,000 indemnity insurance policy was not an "equivalent bond", points to the SEC attorney's "approval" of the exchange. But the SEC attorney would later depose that his "approval" of a substitution of the escrow was an unnecessary formality, respondent's firm being fully authorized, by the Federal court order, to substitute a genuine equivalent bond for the cash and bonds already in the escrow without anyone else's approval. The SEC attorney candidly admitted that he did not review the policy to determine its "equivalence" to the escrowed assets, but rather merely initialed the cover letter sent by respondent's firm on the understanding that he was simply confirm-

ing his concurrence with Rubin on the telephone the day before, that an appropriately equivalent bond could be substituted.

Respondent's position thus is based upon the misguided directions of the now absent Manley (in whom respondent apparently placed full faith and confidence), the unquestioning acts of Rubin (the firm's managing attorney, whom the Hearing Panel found to be "not a particularly credible witness" in giving "plainly disingenuous testimony"), and the act of a SEC attorney in initialing his approval of the substitution of what he was told would be an equivalent bond—an act which certainly was not judicially mandated but was performed merely as a courtesy.

Finally, respondent's position is that the exchange of the purportedly equivalent bond for the two $12,500 bonds and the cash proceeds from the sale of the *Pied Piper* worked a "release" of this portion of the escrow, and that the escrow account had thus been "closed". This was, in fact, the terminology used by Rubin when he briefed respondent on the status of this case. On February 12, 1975, upon returning from a trip overseas, respondent wrote to the court-appointed trustee pendente lite: "[M]y recollection of this matter is that there was some money held in escrow, but that escrow terminated when, with the Court's permission and the SEC's consent, a bond procured by the company was substituted for the escrow account. As far as I know that is the last anybody at the law firm had to do with that transaction. We were told (by someone in the SEC, I believe) that at a considerably later date that the bond had lapsed after having been in effect for a considerable period of time."

On April 10, 1975, the trustee wrote to respondent's firm, reviewing the dissipation of the escrow and formally demanding remittance of the full amount of the escrow ($219,000) by April 20. On April 21, respondent replied to the trustee by letter: "The escrow money to which you refer was released after a consent order permitting the substitution of a bond by Pied Piper in Chicago directly. From that point on, this firm had absolutely nothing to do with that transaction."

Respondent's firm, as escrow agent, held the funds and property in question as a public trust, to protect the public shareholders of the company from a fraud which respondent's clients were alleged to have perpetrated upon them. It goes without saying that anyone placed in a position of public trust

as an escrow agent cannot dispose of the entrusted assets without an order of the court which created the escrow.

Meanwhile, in December 1972 respondent caused the *Defiance* to be remortgaged. Respondent says this was brought about by the fact that University National Bank of Chicago, which held a first mortgage on the vessel, had called its mortgage and demanded immediate payment. Respondent thus had to shop around for a "replacement" mortgage in an amount $6,000 higher than the previously existing mortgage. The $85,000 loan so obtained was used to satisfy the previously existing mortgage and to "pay attendant closing costs." Even though the escrow order specifically prohibited further hypothecation of this asset, respondent urges that the new mortgage, rather than representing a further encumbrance, was merely a "replacement" of the old mortgage, at an increase in face value that was "de minimis"—an amount just large enough to cover the firm's closing costs in the transaction. Whatever the merits of this reasoning, the refinancing decision was taken unilaterally, respondent evidently feeling no obligation to consult with or obtain the approval of the court which had entrusted this asset to respondent's firm under conditions strictly controlling its financial state. Indeed, respondent now argues that since it was his understanding that "Saxe Bacon's escrow obligations had ended upon substitution of the $120,000 bond", he no longer had to account to anyone for any of the assets in the escrow.

It need not be belabored that the placement of the *Defiance* in escrow was entirely independent of that portion of the order protecting the assets or proceeds of the *Pied Piper*. Respondent would have us believe that the wrongful dissipation of the latter somehow released the escrow agent of all further obligations and thereby justified financial dealings with regard to the former which were clearly not sanctioned by the court. Such logic is rejected under the most rudimentary rubric that two wrongs do not make a right.

This was not the end of the *Defiance*. A crueler fate was in store. In June 1973, while under charter to respondent's firm, the *Defiance* sank. The vessel was insured at the time for $200,000, of which only 90% was paid in settlement of the claim. The events which ensued cast serious doubt upon respondent's professional conduct and integrity, both as an attorney and as an escrow agent. In the first place, the loss of the *Defiance* was not communicated to the Federal court until more than seven months later, notwithstanding several court

appearances in the interim. Indeed, the SEC first learned of the loss of the vessel from an article in *Newsweek* magazine in January 1974. Respondent appeared with SEC attorneys before a magistrate shortly thereafter, and was asked to provide full data on the loss of this valued asset immediately. In February 1974, respondent notified the SEC and the Federal court by letter that he was "trying to amass the information" on the loss and "obtain a copy of the [insurance] policy", and would be back in touch with these authorities as soon as all this information was compiled. Nine months later, in November 1974, respondent continued to cover up the truth by stating on the record in Federal court that the insurance proceeds "ha[ve]n't been paid, your Honor. The substantial part that was paid went to pay the premium on the insurance. There is a substantial amount that is due, and will be assigned over to this fund. There are other assets. This matter could all be worked out. There is no problem on the working out of this, your Honor."

In fact, as early as October 1973, four months after the sinking of the *Defiance* and three months before any of the other interested parties learned of the loss, respondent was already counseling Coda, the president of his corporate client (who had already made off with at least $94,000 from the other half of the escrow 21 months earlier), on what to do with the insurance proceeds, which respondent then believed would amount to $195,000. In a letter drafted by respondent in longhand, to be sent to the charterer who would receive the insurance proceeds, the corporate officer was counseled to authorize the use of the proceeds to purchase a new 60-foot yacht (approximately $125,000), pay respondent and his firm and any others who had lost personal property on the *Defiance* (approximately $25,000-$35,000), and apply the balance to reduction of the new mortgage. The actual disbursement of the first $100,000 of the insurance settlement was as follows:

—$50,000 applied toward the new mortgage;

—$15,965 to respondent's firm to repay a loan purportedly made for the insurance premium, notwithstanding the clear requirement in the escrow order that the responsibility for maintaining insurance should be borne by the clients;

—$15,875 to respondent's firm for legal fees and disbursements;

—$1,098 to a law firm in Florida;

—$17,062 to persons who allegedly lost personal property

when the boat sank, including respondent and the firm itself; the court was later informed by respondent's partner, Thomas Bolan, that this amount included $7,100 to the firm and $7,950 to respondent personally.

This court views with grave concern the wrongful dissipation of an escrow fund *(Matter of Wiseman,* 107 AD2d 161, 162). Involved here were violations of an escrow, established by a court order which had set forth specific directions for composition of the fund. The escrow agent is a fiduciary whose authority in this instance was derived from that order of the court. As such, respondent's firm was strictly bound by the escrow order until fulfillment of its terms and conditions *(Schuman v Conforti,* 41 AD2d 661). The escrow agent was not authorized to disburse these assets except as specifically authorized in the order creating the escrow. This obviously would not have been directed by the court or its trustee until after judicial determination of entitlements. Any unilateral determination by the escrow agent to disburse escrowed assets to creditors[4] or attorneys was violative of the order *(Gershen v Gershen,* 6 AD2d 862).

We view with particular alarm the fact that of the first $100,000 in insurance proceeds on the loss of the *Defiance,* $46,890 was disbursed by the firm to itself and to respondent personally. An escrow agent is only a custodian, and has no lien on property entrusted to it as compensation for services or expenses in connection with the escrow *(Entertainment & Amusements v Barnes,* 49 Misc 2d 316).

In summary, respondent personally negotiated an escrow agreement whereby his firm was appointed as escrow agent to safeguard two major assets of a corporate client under judicial attack. The first asset, worth $119,000, was lost when the managing attorney and a junior partner in the firm, supposedly working under respondent's supervision, effected a substitution of a worthless bond for this asset and then immediately caused disbursement of the asset itself, supposedly without respondent's knowledge, to the very person against whom the bond had initially been procured to protect corporate assets. Thereafter, the second major asset was lost, and the insurance proceeds, rather than being deposited into the escrow account, were disbursed to creditors, including respondent's firm and

---

4. The Federal court subsequently denied the substitute mortgagee's claim to a major portion of the $80,000 balance of insurance proceeds from the loss of the *Defiance.*

respondent himself. Even after the worthlessness of the substituted bond was exposed, respondent continued to justify the firm's action with regard to the second asset on the "understanding" that the substitution for the first asset had somehow terminated the escrow and released the agent from any further obligations. Such reasoning did not convince the Federal court, which found respondent (who was "[t]he principal representative of the firm at all relevant times") and his firm liable for contempt in violating the escrow order.[5] This court is equally unconvinced. The recommendation of the Hearing Panel on this charge is accordingly sustained.

### CHARGE III—THE ROSENSTIEL CODICIL

The late Lewis S. Rosenstiel, multimillionaire, philanthropist, founder of the Schenley Distillers empire, was a long-time acquaintance of respondent. Formerly a resident of Connecticut, Rosenstiel had suffered a debilitating stroke in 1971, which left him partially paralyzed on his right side and speech impaired. Thereafter, he spent a good deal of time in Florida. On September 16, 1975, upon his arrival from Connecticut in ill health, the 84-year-old Rosenstiel entered Miami's Mt. Sinai Hospital in an effort to control his vomiting. This was to be his terminal illness; he died at the hospital on January 21, 1976. The events in question took place in his hospital room 6½ weeks before his death, during the first weekend in December 1975.

At the time he entered the hospital, Rosenstiel was already in poor health, with a history of diabetes, high blood pressure, prostate cancer and assorted heart and blood disorders. His eyesight was poor,[6] with practically no vision in one eye and limited vision in the other, and he could walk only with assistance.

Rosenstiel had contemplated death before, at a time when he was unquestionably in control of his faculties. In December 1970 he executed a will, prepared by Greenbaum's firm, in which The First National Bank of Miami (later identified as

---

5. *See,* pp 46-47, *infra.*

6. Rosenstiel's personal attorney, Maurice C. Greenbaum, testified that as secretary of the Rosenstiel Foundation, he had occasion to send correspondence to Rosenstiel from time to time. In later years, this correspondence was always typed completely in capital letters, to make it easier for Rosenstiel to read. After 1974, when it became difficult for him to sight read anything, Rosenstiel would ask Greenbaum merely to read the material to him over the telephone.

Southeast First National Bank of Miami) was named as executor of his estate in Florida and trustee of a testamentary trust established in the will. Greenbaum and Wilbur Duncan were named as executors for any portion of the estate outside the State of Florida. The proceeds of the $500,000 testamentary trust were to be enjoyed in life estate by Rosenstiel's stepdaughter, Diane Katleman Deshong. Upon Deshong's demise, half of the principal of that trust was to go to Rosenstiel's daughter, Elizabeth Carol (Libby) Rosenstiel. The only other mention of Libby in the will was as beneficiary of all the contents of Rosenstiel's house in Greenwich, Connecticut. The will also referred to an inter vivos trust, created outside the will on the same day as the execution of the will, with Rosenstiel and Greenbaum having been designated as trustees in that separate trust instrument. The inter vivos trust would contain the bulk of the Rosenstiel fortune. The remainder of Rosenstiel's estate was to go to this trust upon his death. A year later, another trust was created, outside the will, with identical dispositive provisions. In August 1972 Rosenstiel executed a codicil[7] to his will, whereby he canceled any outstanding indebtedness to him, by his wife Blanka or his daughter Libby, that might exist at the time of his death.

Greenbaum and his firm became general legal counsel to Rosenstiel around 1968, except with regard to some legal matters then pending. Rosenstiel had had a bitter matrimonial dispute with his former (fourth) wife, Susan, and respondent had represented him in this litigation.[8]

With this as background, respondent effected the execution of a purported codicil to Rosenstiel's will in the latter's hospital room on December 6, 1975. The one-page document, witnessed by respondent and David A. Tackett, respondent's friend who had flown to Florida with him for the weekend,

---

7. The preamble to this properly drafted two-page instrument identified it as a codicil to Rosenstiel's last will and testament dated December 11, 1970. The first paragraph contained the change, referring to the specific paragraph in the will that was to be amended. The second paragraph declared the ratification, confirmation and republication of his last will and testament of December 11, 1970, as modified and amended in this codicil. The three witnesses attested that Rosenstiel had subscribed this document as a codicil to his last will and testament of December 11, 1970.

8. A rivalry between the two attorneys is suggested by the fact that in the years before Rosenstiel's death, Susan had sued for an increase in alimony. Respondent apparently had suggested a counterclaim to reduce the alimony. Greenbaum counseled Rosenstiel to the contrary, suggesting that he be content to have Susan's suit dismissed.

declared that this was "a codicil to my last will and testament and any codicils thereto." No identifying reference was made to the will or any prior codicil by date. The body of this codicil did not refer to any specific paragraph in the will. Rather, in general terms it provided as follows: "In addition to the Executors and Trustees heretofore designated by me, I hereby appoint my friend and attorney, ROY M. COHN, my granddaughter CATHY FINKELSTEIN, and her husband JAMES FINKELSTEIN, as additional Executors and Trustees of my Last Will and Testament, and request that no bond or other security be required of any of them in their capacity as such Executors and Trustees." The purported testamentary signature consists of a number of "squiggly" lines which in no way resemble any letters of the alphabet. Thus,

(L.S.)

An expert document examiner testified at the probate proceedings that he could find "no legible characters of any nature" in this purported signature, and that he had never seen anything like it in all his years of experience.

Respondent testified that Rosenstiel's purpose in executing this codicil was to see to it that his beloved daughter Libby was properly taken care of. Cathy was a niece of Libby (although they were contemporaries in age), and according to respondent, the Finkelsteins[9] would diligently look after Libby's interests and ward off attacks on the estate after Rosenstiel's death. Respondent and his partner, Thomas A. Bolan, who had drawn the codicil in New York some days earlier, testified that Rosenstiel wanted to do this without the knowledge of his personal attorney and inter vivos cotrustee, Greenbaum, because the latter was not aggressive enough.

According to respondent, he and David Tackett arrived in

---

**9.** Since divorced.

Miami on the night of December 5, 1975. They were met at the airport by friends who took them to dinner for the evening. Respondent then went to the hospital the next morning to visit Rosenstiel, arriving around 9:30 or 10 o'clock. He denied going directly to the hospital on the night of his arrival in Miami.

This was directly contradicted, in the Florida probate proceedings, by Richard B. Zaccaro, a private hospital attendant who worked the 7:00 P.M. to 7:00 A.M. shift on both the night of December 5-6 and the night of December 6-7. Zaccaro testified that sometime on the evening of December 5 respondent arrived at the hospital, carrying a bag, and said he had just come from the airport. He left his bag in the hallway outside Rosenstiel's room and went in, asking Zaccaro about Rosenstiel's condition. Zaccaro, who had never seen respondent up until this time, told respondent that Rosenstiel had been put on the critical list, and that there was no change. According to Zaccaro, respondent then went to Rosenstiel's bedside and said something to the effect that a matter with regard to a woman was coming along all right, and that respondent wanted Rosenstiel to sign a paper, which he put in front of the patient. But according to Zaccaro, Rosenstiel was "completely out of it" at this point, "almost comatose", and the best respondent could do was "once in a while get a moan out of him". At one point respondent put the paper on a bed table and "tried to take [Rosenstiel's] hand for him to sign it." This effort was unsuccessful because the patient "had no mobility" and "couldn't move his hand if he tried." Zaccaro and the on-duty nurse, who was "in and out" of the room, were busy at the time, prompting Zaccaro to suggest that respondent come back in the morning. After 15 or 20 minutes, respondent agreed, and left with the same piece of paper in his hand.

Zaccaro testified that when he came on duty the following evening (December 6, at 7:00 P.M.), Rosenstiel appeared to be in the same condition—incoherent, inaudible, unresponsive and "practically comatose." In Zaccaro's opinion, Rosenstiel definitely was not in any condition to make personal decisions or handle business matters. In fact, the "joke" circulating on the floor on the night shift of December 6 was that Rosenstiel had somehow signed some important document earlier that day.

Respondent and his companion, David Tackett, arrived at the hospital to visit Rosenstiel on the morning of December 6.

Two nursing attendants were on duty at the time. Staff Nurse Trudy Philogene testified at the probate proceeding that respondent, upon his arrival, had told her that he had some papers for Rosenstiel to sign. When she protested that respondent could not be permitted to make the patient sign any papers in the absence of his wife or daughter, respondent told her "This is something concerning Susan, papers." Nurse Philogene was aware of a doctor's order, entered in the hospital record, cautioning staff not to permit business discussions between this patient and visitors. But she was also aware that respondent had been representing Rosenstiel in litigation with a former wife. She decided to summon Thomas Springer, Rosenstiel's personal nursing attendant. Springer was also aware of the doctor's order restricting visitors from presenting any business matters to Rosenstiel. He was greeted by respondent who first asked how Rosenstiel was, and then indicated that he had "a matter of a little unfinished business with Susie". According to Springer, respondent tried to engage in some small talk with Rosenstiel, without getting much response. Springer then heard respondent tell Rosenstiel: "I have a paper here I would like to get signed today to terminate the affairs of Susie." Respondent told Rosenstiel that things were not going too well with his former wife, that there was a possibility she might be going to jail, and that "[t]his will take care of it". Nurse Philogene heard respondent say that this was "[j]ust some paper I have to make Mr. Rosenstiel sign about the Susan case." At this point, Nurse Philogene, asserting her authority, indicated that it would be against hospital policy for any papers to be signed under these circumstances, and she went off to summon a hospital administrator, cautioning Springer not to sign anything as a witness. When Springer returned to Rosenstiel's hospital room, he found respondent at the bedside, saying: "You know all these things, Lew, she hasn't got a leg to stand on and all this stuff, this will take care of it once and for all. It will be finished." At this point, respondent turned to Springer and asked him to witness a signature. Springer declined, saying that his concern was for the patient's physical well-being, not his personal affairs. Springer volunteered that there was a notary public in the hospital whose responsibility it was to witness signatures, and that the notary could be called in. Rather than accept this offer, respondent indicated that his companion, Tackett, would serve as a witness. Springer then suggested that Joseph Pearlman, Rosenstiel's long-time advisor and counselor who

was staying at the Rosenstiel home, be called to give his approval. According to Springer, respondent spoke with Pearlman and then handed the telephone to Springer who heard Pearlman say that it would be all right to go ahead with the signature. Neither Springer's testimony nor Pearlman's deposition gives any indication of knowledge that a testamentary document was about to be signed. At this point, Springer excused himself, and respondent and Tackett approached the bed. As Springer left the room he heard respondent and Tackett say: "We will help you, Lew, to sign." Springer then stood outside the door, which was left ajar. At no point, when he was in the hospital room or outside, did he hear the document being read aloud to respondent. A few minutes later, Nurse Philogene returned with a hospital administrator who entered the room and offered his assistance. The administrator testified that he had gone with Nurse Philogene after being told that the visitors were trying to get some papers signed. In response to his offer of assistance, he was told that they were "just visiting", that they "weren't here to get anything signed."

Respondent and Tackett then departed, leaving behind a document for delivery to Blanka Rosenstiel, which turned out to be a 21-month-old affidavit of service related to the litigation between Rosenstiel and his former wife Susan. The purported codicil was retained by respondent until after Rosenstiel's death, at which time it was produced and first made known to Rosenstiel's executor, trustees and other members of his family.

The testimony of respondent and Tackett contradicted that of the hospital staff witnesses. While acknowledging that he had been told it would be against hospital rules for a patient to sign anything, respondent denied being told that Rosenstiel was in no condition to sign anything, and denied telling anyone that the purpose of his visit was to obtain a signature pertaining to the matrimonial litigation with Susan. He denied any knowledge of a doctor's order prohibiting business discussions with Rosenstiel, denied asking the hospital staff members to be witnesses to the document, and denied ever indicating, when he departed, that the document he left behind was what Rosenstiel had just signed. When asked if it had been suggested to him that he get a notary public, he answered "I don't believe so." He acknowledged that Nurse Philogene had gone to seek an administrator for permission for Rosenstiel to sign a document, but admitted that he had

gone ahead with the execution of the document anyway, in her absence. Respondent further denied telling the hospital administrator that he was there for just a social visit, not to transact any business. He contradicted the assertion that he allegedly had told Rosenstiel that the document about to be signed had something to do with former wife Susan. In fact, respondent testified that he recalled specifically discussing the *codicil* with Rosenstiel in the presence of both Nurse Philogene and Springer.

Dr. Ronald Scherr, who was Rosenstiel's treating physician, testified that a brain scan in early October 1975 had revealed marked brain atrophy or senility, as evidenced by a widening of brain fissures. This was consistent with Alzheimer's disease, which would cause diminished comprehension and awareness of surroundings. On October 17, Dr. Scherr had the following instruction entered in Rosenstiel's medical records: "Please do not permit business discussions between patient and visitor." Rosenstiel's main problem was his prostate cancer, but this was complicated by anemia, which would further diminish his comprehension, judgment and awareness of surroundings. Rosenstiel also had a seriously high BUN (blood/urea/nitrogen) level, which resulted in disorientation, lethargy and general loss of perception. Rosenstiel was being treated with Thorazine, a powerful tranquilizer, and on the weekend in question was receiving four injections per day. On December 6 he received one such injection at 7:00 A.M. The drug remains functional for 8 hours, and thus would further diminish the patient's perception and awareness. Dr. Scherr testified that Thorazine would cause a 20 to 30% diminution of perception and awareness in an otherwise normal person, and the high BUN rating would diminish such a patient's alertness and awareness another 15%. All in all, Dr. Scherr opined that Rosenstiel would not have been able to make decisions with regard to important personal business matters, or even carry on an intelligent conversation, on December 6.

Also testifying at the probate proceedings was Dr. Eugene Rosenberg, Dr. Scherr's associate, who had actually examined Rosenstiel on the weekend in question, and in particular, at 8:45 on the morning of December 6. Dr. Rosenberg described Rosenstiel's general condition as including congestive heart failure, pulmonary edema and neurological problems, resulting in confusion, lethargy and disorientation. In his opinion, Rosenstiel was not competent to understand personal or business matters, or to make decisions of importance on the

morning in question. While Rosenstiel could do reflexive activities, including giving yes or no answers, he was, according to Dr. Rosenberg, incapable of any activities involving recollection or requiring intelligent comprehension of events (times, persons and places).

Dr. Harold Reed, a urologist who also examined Rosenstiel at about 9 o'clock on the morning of December 6, concurred that this was a patient whose mental functioning was in a primitive state, on the fringe of discoordination, rendering him not "sufficiently comprehensive to make decisions about business matters of importance."

Nonmedical witnesses also testified at the probate proceeding with regard to Rosenstiel's competence. Witnesses in support of the purported second codicil referred to visits and lucid conversations they had had with Rosenstiel in his hospital room generally contemporaneous with the execution of the codicil on December 6. Others, including very close associates, described Rosenstiel's condition as so deteriorated as to be "completely out of it" and generally too sick to comprehend or have the capacity to understand and make decisions with respect to his personal and business affairs.

For example, Jerry Finkelstein, James' father, submitted to deposition (which, incidentally, was never read into the record at the probate proceeding),[10] testifying that he visited Rosenstiel on the morning of December 7, 1975. During a 10 to 15 minute visit, "Roy indicated [to those present] that he has Lew's permission and Lew wanted him to tell me that Jimmy and [C]athy were made trustees, executors of his affairs. He hopes that they take good care of Libby." The feeling was that Jimmy would be tough enough to prevent anyone, such as ex-wife Susan, from raiding the estate at Libby's expense. He added that the appointment of Jimmy and Cathy to positions of executorship and testamentary trusteeship was to be "kept confidential for the time being", and that respondent was himself to play a similar role in Rosenstiel's affairs. Jerry Finkelstein acknowledged that respondent had done most of the talking during this visit, although Rosenstiel seemed to acknowledge everything that respondent said.

This testimony was directly contradicted by the deposition of Joseph Pearlman, who had visited Rosenstiel with Libby on the afternoon of December 6. By this time Libby had learned

---

**10.** Jerry Finkelstein did testify on the record, on respondent's behalf, at these disciplinary proceedings.

from the hospital staff about respondent's visit that morning, and Pearlman observed that Rosenstiel was unable to recall for Libby what he had signed earlier in the day. In Pearlman's opinion, Rosenstiel was at that time "not capable of engaging in any form of business decision or conversation whatsoever". His version of the exchange between Libby and Rosenstiel was corroborated in the testimony of Nurse Adele Rosen, who added that Rosenstiel was absolutely incapable of being alert enough to make an important personal or business decision at the time.

In light of the emphasis at the probate proceeding on portraying the purported second codicil as an effort by the testator to protect the interests of his daughter Libby, we note that the will itself gave only a remainder interest to Libby after extinction of a life estate created for another by a testamentary trust in the will. Aside from this remainder interest and the furnishings in the house in Greenwich, Libby's only other interest in Rosenstiel's estate apparently came from the inter vivos trust referred to in the will; but the trustee of that trust was designated by the terms of that instrument outside the will. Thus, the purported codicil of December 1975 would have had virtually no effect on Libby's inheritance. These details certainly would have been known by Rosenstiel and Greenbaum. The enigma of the language in the document witnessed by respondent thus casts doubt upon its validity as a testamentary instrument.

Although Libby Rosenstiel and Cathy Finkelstein were more or less contemporaries, they had relatively little social contact. The question therefore naturally arises as to why respondent and the Finkelsteins were to be made "additional Executors and Trustees" under a will whose contents were apparently unknown to the drafters of this purported codicil. Some light may be shed on this question by taking note of the fact that Cathy Finkelstein's father and brother, and a California bank acting as trustee of a trust for Cathy's benefit, later submitted a total of 10 claims against the Rosenstiel estate, amounting to more than $4.4 million. Aside from the sizeable commissions to be earned by the representatives of an estate of this magnitude, the purported second codicil would have given Cathy Finkelstein and her family majority control of the executorship in settling claims against the Rosenstiel estate. While there is no indication or assertion of fraud in this respect, it certainly ill behooves respondent, under these circumstances, to pursue the notion that the purported second

codicil was primarily for the purpose of protecting the interests of Rosenstiel's beloved daughter Libby.

The Florida court initially admitted this second codicil to probate and issued letters of administration to Cathy and James Finkelstein as co-personal representatives of the estate.[11] After extensive hearings brought on by the executor named in the will, the court revoked the admission of this second codicil to probate as well as the letters of administration previously issued to the Finkelsteins, finding that the testator had not possessed testamentary capacity and thus, had been incapable of voluntarily executing a valid testamentary instrument on December 6, 1975. In so doing, the court found from the evidence that respondent had misrepresented the nature, content and purpose of the document he had offered to Rosenstiel for execution, and that as a result the testator had had no conscious testamentary intent to execute a codicil in respondent's presence.[12]

■ The Disciplinary Hearing Panel came to the conclusion that there was no reason for respondent to have engaged in any surreptitious or fraudulent misconduct in order to obtain Rosenstiel's signature on this codicil, nor was there any reason for him to misrepresent the nature, content or purpose of the instrument at the time he offered it for execution. We reject this conclusion. The facts speak for themselves. At the very least, it was highly unethical for respondent to have persisted in procuring the execution of a testamentary instrument from a hospitalized patient of questionable mental capacity, especially after being told by hospital and nursing staff members that such actions were against hospital policy and should not be done without the presence of a hospital administrator or a member of the patient's family. Respondent was aware that a notary public was available, and that a hospital administrator was in the process of being summoned. Respondent's role in the execution and witnessing of this document made his conduct particularly reprehensible in light of the fact that this codicil was designed to give him, *inter alia,* a personal interest as coexecutor of the testator's sizeable estate.

Notwithstanding respondent's assertion that this codicil

11. As it turned out, respondent was unqualified to act as executor and trustee under the will, inasmuch as he was neither a Florida resident nor a relative of the testator. The Finkelsteins were qualified, however, as relatives of the testator.

12. *See,* p 47, *infra.*

represented the culmination of months of discussions with Rosenstiel, we conclude that the drafters of the codicil knew little, if anything, about the terms of Rosenstiel's existing will, as evidenced by their discredited efforts to portray this codicil as one designed to protect the interests of Rosenstiel's daughter Libby. Had respondent truly been taken into the testator's confidence, he would have known that the will, and any executors or trustees named therein, had little to do with Libby's inheritance. If, indeed, Rosenstiel had indicated or acknowledged that this purported second codicil was designed to protect Libby's interests, we would take that as further evidence of the diminished mental capacity of a man whose business acumen and sense of economics had once built a financial empire.

Finally, we credit the testimony of the disinterested hospital staff witnesses in contradistinction to respondent's testimony as to the discussions in the hospital relating to the nature of the document that was signed on December 6, 1975. The hospital witnesses were absolutely certain that no mention had been made of a testamentary instrument, and they were all aware that the conduct of personal business affairs had been strictly proscribed by Dr. Scherr's order of October 17. It strains credulity for respondent to argue that all the testimonial references by the hospital staff witnesses, relating to the litigation with Susan, had been manufactured out of whole cloth. The document from that litigation, which respondent left behind for Blanka, was so insignificant to respondent's visit to the hospital that day that he need not have mentioned it at all. It certainly had no connection with the requirement to obtain Rosenstiel's signature. Respondent cannot now deny that the main purpose of his visit that morning was to effect the execution of the codicil. In this respect, we find respondent's testimony with regard to events in the hospital room on December 6, 1975 to have been untruthful, misleading, and evidence of highly unprofessional conduct for an attorney-at-law.

Accordingly, we reject the recommendation of the Hearing Panel and hereby sustain charge III.

### CHARGE I—THE D.C. BAR APPLICATION

Respondent is accused of answering falsely, under oath, certain pertinent questions on his application for admission to the Bar of the District of Columbia on July 28, 1982.

Petitioner's Hearing Panel has recommended sustaining two of the three specifications of this charge against respondent. The first of these concerns respondent's answer to question 8 (b) of the application. That question was in two parts. The first asked: "Are any charges or complaints now pending concerning your conduct as an attorney, or as a member of any profession, or as a holder of any public office?" Respondent answered: "No". The second part of this question asked: "If so, state the name, and address of the authority in possession of the record thereof." Notwithstanding already having answered the question in the negative, respondent offered this response to the second part: "Except usual crackpot complaint letters following media appearances, etc. Know of none pending."

This was an untruthful response. In fact, respondent was then on notice from petitioner that three complaints of a disciplinary nature were pending against him, namely, the Schlesinger, Pied Piper and Rosenstiel matters. Respondent acknowledges having received inquiries from petitioner on each of these matters. The record reveals petitioner's notification to respondent of Mrs. Schlesinger's complaint in January 1980, correspondence between petitioner and respondent on the Pied Piper matter from July 1976 through October 1977, and correspondence between petitioner and respondent on the Rosenstiel matter from October 1977 through May 1980. In none of these cases did the last cited correspondence on file indicate a closing of the matter. We are informed that these were not the first instances in which respondent had disciplinary complaints lodged against him. Respondent was well aware that in all prior cases the inquiry pursuant to the complaint was terminated by a letter from the Disciplinary Committee indicating that the matter had been resolved. No such correspondence had been received by him in any of these cases. Nevertheless, respondent now tells us that "the question as formulated [in the D.C. Bar application] did not call up an association in his mind with letters of inquiry he [had] received about the *Rosenstiel, Pied Piper* and *Schlesinger* matters" because there had been no correspondence within the last two years.

Respondent brought before petitioner's Hearing Panel a former president of the Washington, D.C., Bar to testify that charges in the District of Columbia are not considered "pending" until a decision is made to prosecute, and that such pendency is certainly not based upon mere complaint letters on file. This ignores the fact that the serious allegations

against respondent—which were certainly much more than the "usual crackpot complaint letters"—were then pending in New York, where respondent was quite familiar with the procedure, and not in the District of Columbia, whose procedure in treating disciplinary complaints was irrelevant to the question at hand.

We cannot imagine any attorney taking such complaints lightly, regardless of how frivolous the complaint might be. Not only was respondent well aware of the fact that these charges would remain "pending" against him until he received correspondence from petitioner resolving the matter, but the passage of two or more years could not have dulled respondent's memory of these underlying events and their significance. Indeed, the application revealed that respondent's memory on disciplinary complaints is quite good. In question 8 (a) respondent was asked if he had ever been disciplined as an attorney. He answered in the negative, but in the details section he gratuitously added that he had once been "criticized" by a subcommittee of the Grievance Committee (petitioner's predecessor) for a "newspaper story". We are informed that this refers to an admonition respondent received from petitioner's predecessor in May 1960 for improperly releasing to the press a statement that a client of his was about to bring about a lawsuit.[13] It is interesting to note that respondent had no trouble recalling this 22-year-old disciplinary "criticism" for inclusion in his Bar admission application, but did not consider important enough for inclusion the rather weighty charges and complaints then pending against him before the same authority in New York.

The second specification on which discipline is recommended is respondent's negative answer to question 16 (b): "Have you ever been adjudged liable in a civil action or proceeding involving a claim of fraud, conversion, breach of fiduciary duty or legal malpractice?"

On February 25, 1976 District Judge Edmund L. Palmieri, in the United States District Court for the Southern District of New York, ruled[14] that respondent and his firm had repeat-

---

13. Respondent was initially charged with giving a false and overly vague answer to this question as well, but petitioner has accepted the Hearing Panel's recommendation that the answer to question 8 (a), however vague, did sufficiently flag the attention of the D.C. Bar admission authorities as to that prior discipline.

14. *Securities & Exch. Commn. v Pied Piper Yacht Charters Corp.*, 71 Civ 5341 (SDNY Feb. 25, 1976).

edly and flagrantly violated the Pied Piper escrow order; that contempt was an appropriate remedy; that an escrow agent is liable for damages for failure to comply with its obligations; that respondent's firm was the escrow agent, making the firm and each of its partners jointly and severally liable; and that respondent himself was "individually liable for the entire amount in question since he was a partner from shortly after the establishment of the escrow until the partnership was incorporated, and has been actively in charge of this litigation both during and since that time."[15] Respondent and his firm were directed to reconstitute the escrow fund in the amount of $219,000 plus interest, costs, fees and disbursements, and to turn this amount over to the court-appointed trustee.

By no stretch of the imagination could Judge Palmieri's order be considered anything other than a judgment of liability. As such, it should have been included as an affirmative response to question 16 (b) on the D.C. Bar admission application.

On June 24, 1976, Circuit Judge Frank B. Dowling, of the Probate Division in the Eleventh Judicial Circuit Court for Dade County, Florida, revoked, annulled and set aside the purported second codicil to the will of the late Lewis S. Rosenstiel, as well as the letters of administration previously issued to Cathy and James Finkelstein. In the last paragraph of his opinion,[16] in which he concluded that the testator had lacked the knowledge or understanding to execute a codicil with conscious testamentary intent, Judge Dowling wrote: "The Court further finds from the evidence that ROY M. COHN misrepresented to the decedent, LEWIS S. ROSENSTIEL, the nature, content and purpose of the document that he offered to MR. ROSENSTIEL for execution." Judge Dowling's order thus constituted a decree of liability against respondent involving "fraud * * * breach of fiduciary duty or legal malpractice". As such, it should have been noted in an affirmative response to question 16 (b) of the D.C. Bar admission application.

■ Making materially false statements and omissions on a Bar admission application erodes the very integrity and competence of the legal profession, and warrants discipline (Code of Professional Responsibility, DR 1-101 [A]). Respondent's failure, under oath, to disclose these adverse court findings

---

15. *Id.,* slip opn, at p 46.

16. *In re Estate of Rosenstiel,* Prob Div, No. 76-436, June 24, 1976 slip opn, at p 11.

and rulings on his Bar admission application was inexcusable, and constituted professional misconduct. Accordingly, charge I is sustained.

### CONCLUSION

We reject respondent's defense of laches with regard to the Pied Piper and Rosenstiel matters. Although the final court rulings in those cases predated the onset of these proceedings by six years, we note that respondent's initial response to the petition, in the form of an affidavit and two memoranda of law submitted in January and March 1983, addressed those charges at length, asking that this court not estop him from contesting the court rulings on the merits in these disciplinary proceedings.[17]

■ ■ The fact that the Pied Piper escrow was later replenished and the Schlesinger debt was eventually discharged does not mitigate such misconduct. One cannot continue to avoid discipline by attempting to make victims whole, after a finding of contempt or the initiation of disciplinary proceedings, on the assertion that nobody has been harmed. This is not an equity proceeding; it is an inquiry into professional misconduct.

Avoiding repayment of a financial obligation to a client, violating an escrow order, procuring execution of a testamentary instrument under circumstances of misrepresentation, and omitting judicial findings of misconduct from a Bar admission application are all serious charges which reflect adversely on the legal profession, and the reputation of those who practice before the Bar. One need not be a lawyer to recognize the impropriety of such conduct. For an attorney practicing for nearly 40 years in this State, such misconduct is inexcusable, notwithstanding an impressive array of character witnesses who testified in mitigation.

■ We find the evidence so compelling on each of these four charges as to leave us no recourse but to order disbarment. Accordingly, respondent should be disbarred, and his name stricken from the roll of attorneys authorized to practice law in this State.

SANDLER, J. P., FEIN, LYNCH, ROSENBERGER and ELLERIN, JJ., concur.

---

**17.** Respondent first raised the defense of laches with regard to the Pied Piper and Rosenstiel matters in October 1983, in response to the formal notice of charges.

Petition presented to this court on January 15, 1986 granted in its entirety and respondent disbarred from practice as an attorney and counselor-at-law in the State of New York effective immediately.