[600 NYS2d 3]

In the Matter of MICHAEL F. ERDHEIM, an Attorney, Respondent. DEPARTMENTAL DISCIPLINARY COMMITTEE FOR THE FIRST JUDICIAL DEPARTMENT, Petitioner.

First Department, July 1, 1993

### APPEARANCES OF COUNSEL

*Mady J. Edelstein* of counsel *(Hal R. Lieberman,* attorney), for petitioner.

No appearance on behalf of respondent.

### OPINION OF THE COURT

Per Curiam.

Respondent was admitted to practice at the First Judicial

Department in 1964, and has maintained an office within this Department for such practice at all relevant times since then. In 1992 he was served by petitioner with a notice and statement of charges specifying 23 incidents of professional misconduct stemming from his relationship with six different clients. These charges consisted of conduct involving deceit, misrepresentation, commingling and conversion of assets, failure to account and maintain proper balances, and engaging in prohibited financial activities with respect to clients. A Hearing Panel sustained 21 of the 23 charges and recommended the ultimate disciplinary sanction—disbarment. Our review of the record leads us to grant the petition, confirm the Panel's report, and impose the recommended sanction.

Three sets of charges have to do with conduct ranging from improper maintenance to actual misappropriation of clients' escrow accounts for respondent's personal use. Three more sets of charges involve improper financial dealings with clients, in the form of solicitation of funds under false pretenses, balances of which are still outstanding. Finally, respondent was charged with failure to cooperate with petitioner's investigations of these matters.

*The Morrissey Charges*

Respondent represented Emelda Morrissey in a matrimonial action in the 1980s, winning for his client half of the rather substantial marital property, which included the marital residence. That residence was sold in 1988. The $79,000 down payment was deposited in respondent's attorney escrow account, but the balance of the proceeds (nearly $642,000), which he had also promised to hold in escrow for his client and her husband, was placed instead in an interest-bearing "special" account under respondent's control. The escrow account was soon liquidated in respondent's favor in its entirety, $1,500 accounted for as his closing fee, and the balance of more $77,000 drawn to his personal order and deposited in his checking account. That latter account was soon depleted on debts unrelated to this case. Meanwhile, respondent sent his client a check on the "special" account for nearly $204,000, without any accounting by bill or statement of legal fees to justify his withholding of $135,000 from the client's share. Bank records established that respondent had shifted $194,000 of the funds in this account to his business checking account.

In August 1988 the client's husband obtained an order from this Court, freezing his share of the home sale proceeds in the

escrow account. Notwithstanding that order, respondent withdrew over $300,000 from the escrow account during the next four months, and the remaining $2,300 over the following 16 months. Most of the funds ended up in respondent's business checking account, from which personal and business expenditures were made, totally unrelated to this case. Three of the transfers were made to respondent's checking account, coinciding with overdrafts on that account necessitating needs to replenish negative balances.

In 1989 respondent's client was awarded all of her husband's property in the divorce action. The client never received her husband's initially claimed share of $338,000, nor the client's balance of $135,000, despite repeated demands for release of such funds and an accounting. Respondent led her to believe he had already sent her such accountings, but this was untrue. More than $272,000 remains unaccounted for.

Respondent submitted a document at the hearing purportedly authorizing him to make withdrawals from the special account without notice; this document was determined by the Panel to be a fabrication. Respondent claimed his business account was at all relevant times his escrow account, but that still does not explain the many withdrawals for purely personal purposes from this account, including payments to credit card accounts, dues to his house of worship, college tuition for his daughter, and rent to his landlord.

### The Elghanayan Charges

Respondent was retained by Helen Elghanayan in 1989 in connection with a matrimonial action. Prior counsel had obtained a pendente lite award for the client, requiring her husband to make regular maintenance and child support payments. Respondent obtained an order directing these payments to be made directly from the husband's account to an interest-bearing escrow account maintained by respondent. Two such checks were received in February 1989, totalling more than $164,000. Instead of depositing them into an interest-bearing escrow account, respondent deposited them into his personal savings account, from which he disbursed over $137,000 to the client, or on her behalf, over the next seven months. During this period respondent also made numerous personal and unrelated business transactions from the same savings account, causing the balance to drop below the amount that was supposed to be held for his client's benefit. The client had no knowledge of these transactions, nor did she

consent to such an arrangement. Respondent gave two false accountings to the client regarding the status of these funds, and more than $26,000 remains unaccounted for. In the absence of accurate accounting, respondent was unable to convince the Hearing Panel that there were no funds unaccounted for. The Panel also rejected his alternative argument that any apparently missing funds represented unpaid legal fees.

### The Cohen Charges

Respondent represented Robert Cohen in a divorce action in the late 1970s. The couple sold their house on Fire Island, and the purchaser's down payment of $16,000 was placed with respondent as escrow agent, by agreement with the wife's attorney. Respondent gave several assurances to his adversary counsel and the court that the funds were in escrow, but when it came time to divide these proceeds, adversary counsel had to write five letters to respondent before eliciting a check drawn on his personal checking account, which was returned for insufficient funds. A second check, drawn on his business checking account, was similarly dishonored, and was ultimately replaced with a certified check.

Respondent testified that he had provided adversary counsel with information on the status and location of the funds on several occasions, a representation denied by counsel in her testimony before the Panel. Respondent alternatively argued that at some point after the closing, he was relieved of his fiduciary responsibilities, and the fund thereafter became a mere "accommodation" instead of a true escrow. The Panel correctly rejected this unilateral effort by respondent to escape his escrow responsibilities *(see, Matter of Cohn,* 118 AD2d 15, 30-31, *lv denied* 68 NY2d 712).

### The Katz Charges

In the most serious set of charges, respondent negotiated a settlement of a divorce action in 1986 in which he received lump-sum payments on behalf of his client in excess of $1 million. Over the next 3½ years, respondent requested and received more than $800,000 from his client on the pretense that he would invest this money for her. Over that period he continued to assure her that the money was being safely and gainfully invested. Between June 1988 and July 1991 he sent her periodic checks, ranging in amounts from $5,000 to $10,000, which the client took to represent returns on the

investments he was managing for her. The client and her ex-husband did make efforts to obtain an accounting of the funds transferred to (and supposedly invested by) respondent, resulting in what is described as an incomplete and partly inaccurate "synopsis" prepared by respondent in March 1991. The only written evidence of respondent's arrangement with his client appears to be a letter dated August 3, 1989, in which he purported to confirm their "prior understanding and agreement wherein you have agreed to invest, via loan to me, varying sums of monies, less certain repayments, which I agreed that you will be receiving 18% per annum."

In fact, respondent was depositing these monies into his own accounts, including his business checking account. He described these transfers as personal loans to him, and insisted that he had informed his client of his "cash flow" problems with regard to personal real estate investments, although the true extent of his serious personal indebtedness at the time was never disclosed to this client. Respondent took the position before the Hearing Panel that in the absence of any agreement on the precise use of the money, he felt he was under no restriction from using these funds for personal and business purposes, including family expenditures, personal investments and repayment of personal loans. The Panel correctly rejected this argument, ruling that respondent had engaged in prohibited business transactions with a client without her knowledgeable consent after full disclosure, a violation of Code of Professional Responsibility DR 5-104 (A). Likewise rejected was respondent's effort to convince the Panel that he was free to engage in such transactions because his attorney-client relationship had terminated upon his negotiation of the settlement back in 1986.

## The Solinger Charges

In 1989, while representing a client of long standing, respondent solicited a loan from that client purportedly for investment in what he described as a highly profitable real estate transaction. Respondent sought $100,000, but the client first agreed to lend him only $50,000, repayable within six months at 19% interest, evidenced by a promissory note and loan agreement. Five months later, respondent represented that the investment was doing extremely well, that his overall financial situation was quite positive and that he would like to negotiate a second six-month $50,000 loan. What respondent failed to disclose was that he was, at that time,

significantly in debt to other clients. Furthermore, there is no evidence that the money had ever been invested in a real estate transaction.

The first loan was repaid after respondent bounced an initial check. Several partial repayment checks on the second loan also bounced, and that $50,000 item remains outstanding.

Respondent was dishonest in failing to disclose his true financial status to his client at the time he solicited the loan. Furthermore, it was improper to make such a solicitation from a client. The Panel correctly rejected respondent's argument that his attorney-client relationship had terminated before these loans were made. He also contended that his indebtedness on the second loan was partially offset by monies owed for services rendered. That unsupported argument did not negate his obligation to repay the loan, and his professional misconduct in failing to do so was exacerbated by his issuance of a series of dishonored checks in payment *(see, Matter of Cohn, supra,* 118 AD2d, at 23-26).

### The Gelfman Charges

Respondent had represented this client in two matrimonial actions since 1979. In 1990, while the second divorce was still pending, respondent solicited and obtained a $250,000 loan from the client on respondent's statement that he needed the money quickly for an extraordinarily lucrative real estate investment. The loan was memorialized in a one-page promissory note drafted by respondent, calling for monthly interest at 12% per annum, the principal to be repaid within two years. The loan was supposedly secured by an assignment to the client of respondent's life insurance policies and a security interest in two properties he held. No specific information on the security properties was forthcoming, despite respondent's promise to provide same, nor was any proof furnished of the existence of the life insurance policies. The client was never told that respondent was considerably in debt at the time, and that his interests in the enumerated properties were already encumbered. More than $86,000 remains unpaid on this loan. The Hearing Panel correctly rejected the now familiar defenses that the client had consented to the transaction after full disclosure of all relevant circumstances, that respondent had effectively ceased to function as the client's attorney, and that any balance still due on the loan represents an offset for legal services performed.

We view with the utmost gravity any invasion of client

funds, rendering an attorney engaging in such conduct presumptively unfit for the practice of law *(Matter of Landau,* 180 AD2d 257, 258). The commingling of client funds with personal funds is also considered grave professional misconduct *(Matter of Domingo,* 188 AD2d 78). Respondent's consistent engagement in such practices led the Hearing Panel to describe him as "a menace to the public" whose activities warranted investigation by the District Attorney for possible criminal violations. This record of misconduct, involving the misappropriation of more than $1 million from six clients, was compounded by a failure to cooperate with petitioner's investigations of these matters. Indeed, respondent's actions throughout these proceedings evidenced a pattern of deception, obfuscation and delay, as well as an extraordinary lack of candor and total absence of contrition. We further note that respondent has failed to answer the petition now before us, notwithstanding our grant of additional time to serve such a response. This Court has no alternative but to order respondent's immediate disbarment. The petition is granted, the report and recommendation of the Hearing Panel are confirmed, and respondent is ordered disbarred and his name stricken from the roll of attorneys and counselors-at-law. Respondent is further ordered to make full restitution to his clients (Judiciary Law § 90 [6-a] [a]; *Matter of Kurtz,* 174 AD2d 207, 211).

MURPHY, P. J., CARRO, WALLACH, ROSS and NARDELLI, JJ., concur.

Respondent is disbarred from practice as an attorney and counselor-at-law in the State of New York, effective immediately, and respondent is directed to make full restitution to his clients, as indicated.