[691 NYS2d 668]

BETH A. DAVIS, Appellant, v STATE OF NEW YORK, Respondent.
(Claim No. 85517.)

Third Department, June 17, 1999

## APPEARANCES OF COUNSEL

*Smyk, Smyk & Fahrenz, L. L. P.,* Binghamton (*Stephen D. Smyk* of counsel), for appellant.

*Eliot Spitzer, Attorney General,* Albany (*Laura Etlinger* of counsel), for respondent.

## OPINION OF THE COURT

CARPINELLO, J.

On March 14, 1991, Oscar Linderberry was conditionally released from Auburn Correctional Facility in Cayuga County having been convicted of first degree rape in 1976 and having served 18 years of a 12½-to-25-year prison sentence. His release included certain special conditions, including prohibitions against consuming alcohol and driving a motor vehicle. He was also obligated to participate in sex offender therapy and to attend Alcoholics Anonymous.[1] As of March 1992, Linderberry lived in Cortland County with his ex-wife and was under the supervision of Joseph Maio, a parole officer employed by the State Division of Parole (hereinafter the Division).

On March 6, 1992, Linderberry's ex-wife reported to the City of Cortland Police that he menaced her with a kitchen knife. Police Officer Daniel Merritt investigated the charge, which included interviewing Linderberry on March 7, 1992. At this time Linderberry was "very calm", and Merritt concluded that Linderberry's ex-wife, who had admitted herself into the mental health unit of a local hospital and declined to press charges, was not in any immediate danger. On March 9, 1992, after Linderberry backed out of an agreement with his ex-wife

---

**1.** The record reveals that Linderberry's prior criminal conduct stemmed from two primary problems, his inability to consume alcohol without reverting to violent behavior and his deviant sexual maladjustment.

to check himself into the mental health unit, an arrest warrant was filed charging him with menacing, a class B misdemeanor. Linderberry turned himself in to the police on March 11, 1992 and was arraigned and released on his own recognizance by City Court that same day.

Upon learning of the previous days' events, Maio conducted an investigation to determine whether a parole revocation warrant was indicated. At 9:30 A.M. on March 12, 1992, Maio contacted the Cortland Police about the incident and picked up the arrest report. One hour later, he conducted a home visit and ordered Linderberry to stay away from his ex-wife and to immediately make an appointment for a mental health evaluation. Between 2:30 and 3:00 P.M. that same afternoon, Maio had a conference with Senior Parole Officer Gerald Szczech who, after reviewing police documents and discussing the situation with Maio, decided that a warrant should be issued. Maio was directed by Szczech to execute it the following morning. Several factors went into this decision; namely, Linderberry's positive adjustment while on parole, his release by City Court the previous day, indications that he was not consuming alcohol and had been attending family counseling with his ex-wife on a regular basis, the fact that he moved out of the couple's residence and the extreme weather conditions that day. Less than 10 hours after this decision was made, however, Linderberry went on a violent criminal spree. In addition to abducting, beating, stabbing and raping claimant, he murdered his ex-wife and kidnapped another woman (*see, People v Linderberry*, 222 AD2d 731, *lv denied* 87 NY2d 975; *People v Linderberry*, 215 AD2d 867, *lv denied* 86 NY2d 844).

Claimant seeks to hold the State liable for the injuries she sustained based on the Division's alleged negligence in failing to timely execute the parole revocation warrant on Linderberry. In a prior appeal, this Court affirmed the denial of the State's motion for summary judgment (212 AD2d 939). At the conclusion of a trial, the Court of Claims found no negligence and dismissed the claim. Claimant appeals.

■ ■ We hold that the decision of when and how to execute a warrant is fundamentally a discretionary act, not a ministerial one, particularly on the facts, albeit tragic, of this case. Consequently, the State is immune from liability. Moreover, even if the State is not immune from liability, the evidence supports the Court of Claims' factual finding that the State was not negligent. Accordingly, we affirm.

■ The challenged conduct in this case[2]— a delay in the execution of a warrant—involves precisely the type of policy-rooted decision-making that governmental immunity is designed to safeguard, particularly where, as here, there is an absence of a rule, regulation or statute governing same. It is a well-settled principle that "[w]hether an action of a governmental employee or an official is cloaked with any governmental immunity requires an analysis of the functions and duties of the actor's particular position and whether they inherently entail the exercise of some discretion and judgment" (*Mon v City of New York*, 78 NY2d 309, 313). The principal distinction between discretionary and ministerial acts, as described in *Tango v Tulevech* (61 NY2d 34, 41), is that the former "involve the exercise of reasoned judgment which could typically produce different acceptable results", while the latter envision "direct adherence to a governing rule or standard with a compulsory result". Indeed, " 'discretion is indicated if the powers are "to be executed or withheld according to [a governmental agent's] own view of what is *necessary and proper*" ' " (*id.*, at 40, quoting *Mills v City of Brooklyn*, 32 NY 489, 497 [emphasis supplied]).

The State has governmental immunity from liability for negligence in the execution of the parole violation warrant because the duties and functions relating to the execution of the warrant do entail discretion (*see, e.g., Mesa v United States*, 837 F Supp 1210, 1213, *affd* 123 F3d 1435 ["the function of determining when and how to execute an arrest warrant is quintessentially a discretionary function, involving choices and judgments that are grounded in policy considerations"]; *Patel v United States*, 806 F Supp 873, 878 [decisions by the Drug Enforcement Administration of "when and where to serve [a] warrant * * * are of the sort that are based on public policy considerations"]) and there is nothing "clerical or routine" about the timing and manner in which to execute a warrant (*Mon v City of New York, supra,* at 313; *compare, Glowinski v Braun*, 105 AD2d 1153, *appeal dismissed* 65 NY2d 637 [retiring a warrant by a court clerk is a ministerial act]). Furthermore, the broader governmental interest of preserving for public safety and police agencies the ability to exercise judgment

**2.** Although the claim against the State is framed as a challenge to its delay in executing the warrant, we are persuaded by the State's contention that the true nature of the claim is the negligent performance of a governmental function, i.e., its failure to provide police protection to her (*see, Cuffy v City of New York*, 69 NY2d 255). If the claim was analyzed under this theory, it would clearly fail (*see, e.g., Hurd v Woolfork*, 959 SW2d 578 [Tenn]; *Munoz v Cameron County*, 725 SW2d 319 [Tex]).

and discretion in determining the time and manner in which to execute the multitude of outstanding warrants, all with varying degrees of urgency, outweighs the benefits to be had from imposing liability for an injured member of the public (*see, Haddock v City of New York*, 75 NY2d 478, 484). To this end, we *agree* with the dissent's conclusion that whether an issued warrant is to be executed is indeed compulsory; it is the time frame and manner in which it is executed that entail discretionary judgment and permissible alternative courses of action depending upon the perceived level of danger to the police and to the public.

Here, Szczech, an officer permitted under the regulations to issue warrants (*see*, 9 NYCRR 8004.2 [e]), unquestionably made a judgment call as to when to execute the warrant. The record shows that Maio met with Linderberry at 10:50 A.M. on March 12, 1992, at which time Linderberry was compliant with Maio's instructions, showed no signs of drinking alcohol and acted "[v]ery good, calm [and] reserved". That afternoon, Maio consulted with Szczech about whether a parole violation warrant should be issued, and a decision was made by Szczech to issue the warrant. Since no evidence at that point and time indicated an emergency, and because a snow storm was in progress, a decision was made in the late afternoon hours of March 12, 1992 to wait less than 24 hours to execute the warrant.

The record also shows that Maio intended to seek the assistance of the local police in executing the warrant even though he was authorized to execute it on his own.[3] Under these circumstances, the decision to execute the warrant the following morning—while fatal in retrospect—was nevertheless based on the exercise of judgment and "cannot be held hostage to 'second guessing' after the fact" (*Rodriguez v City of New York*, 189 AD2d 166, 177 [the decision by a police officer to stop and apprehend an individual acting in a suspicious manner or to observe said individual for a period of time is indeed discretionary]). To hold otherwise would require that the thousands of warrants issued daily be executed immediately or subject the State and local municipalities to massive liability, placing an impossible burden on State and local police and public safety agents.

---

3. Notably, Maio testified that the decision to execute a warrant alone or request assistance from city police, the local Sheriff or the State Police "depend[ed] on who [he] was going after". This testimony supports the conclusion that the time and manner within which to execute a warrant entails clear judgment calls.

Morever, the record demonstrates that in March 1992, the governing statute (*see*, Executive Law § 259-i [3]), rules (*see*, State Division of Parol Policy and Procedures Manual, III-IV) and regulations (*see*, 9 NYCRR 8004.2) pertaining to parole revocation were silent as to the time frame or manner in which to execute a parole violation warrant such that the task could remotely be described as ministerial (*compare*, *Boland v State of New York*, 218 AD2d 235).[4] Rather, with respect to the *execution* of warrants, the regulations merely provided that "[t]he warrant for retaking and temporary detention may be executed by any parole officer, any officer authorized to serve criminal process or any peace officer" (9 NYCRR 8004.2 [e]). As no evidence was presented by claimant "to show any immutable departmental procedures that must invariably be followed" when executing warrants (*Rodriguez v City of New York*, *supra*, at 177), we simply cannot agree with the dissent's conclusion that the time frame and manner of executing a warrant are ministerial in nature (*see generally*, *United States v Gaubert*, 499 US 315, 322 [government conduct does not involve an element of judgment or choice if there is a statute, regulation or policy that requires an employee to follow a specific course of action]). To this end, it is difficult to reconcile the dissent's conclusion that it is unpersuaded by our reliance on the lack of any statute, regulation or departmental procedure dictating the time frame or method whereby a warrant must be executed when the dissenter authored a decision denying summary judgment in a prior appeal, citing undeveloped *factual* issues (212 AD2d 939, 940-941, *supra*). The dissent cites no factual support developed at trial for its conclusion that the timing of the execution of the warrant was ministerial in nature. Upon our review of the record as completely developed, we are satisfied, as a matter of law and fact, that the time frame and manner in which the warrant was executed were discretionary decisions for which the State enjoys immunity.

■ Finally, although this Court's inquiry is not limited to whether the verdict is against the weight of the evidence and may factually assess whether the judgment is warranted (*see*, *e.g.*, *Lewis v State of New York,* 223 AD2d 800, 801), we find no

---

4. At the time of this incident, temporal limitations did exist in the parole revocation process. For instance, the Division was required to give an alleged parole violator written notice of the time, place and purpose of a preliminary revocation hearing within three days of the execution of the warrant (*see*, Executive Law § 259-i [3] [c] [iii]) and the hearing must be held within 15 days of execution (*see*, Executive Law § 259-i [3] [c] [i]; *see also*, State Division of Parole Policy and Procedures Manual, VI [A] [2]; Appendix B).

basis to disturb the Court of Claims' conclusion that claimant failed to prove by a preponderance of the evidence that the State was negligent. To this end, we note that the "evaluation of the credibility of witnesses and quality of the proof can best be made by the trier of fact" (*Ogle v State of New York*, 191 AD2d 878, 880). As noted, less than five hours before the decision to delay execution of the warrant was made, Linderberry showed no signs of imminent violence or alcohol use. This being the case, and in light of his prior positive adjustment on parole and the snow storm in progress, the record supports the court's factual finding that it was reasonable for the Division to wait less than 24 hours to execute the warrant.

MIKOLL, J. P. I respectfully dissent.

I disagree with the majority's conclusion that execution of the parole violation warrant was a discretionary function as to which the State is immune from the consequences of its negligence. While "almost any act admits some discretion in the manner of performance, even driving a nail" (Prosser, Torts § 132, at 990 [4th ed]), the State is protected by the doctrine of sovereign immunity only when its action "involves the exercise of discretion or expert judgment in policy matters, and is not exclusively ministerial" (*Haddock v City of New York*, 75 NY2d 478, 484) "[D]iscretionary or quasi-judicial acts involve the exercise of reasoned judgment *which could typically produce different acceptable results* whereas a ministerial act envisions direct adherence to a governing rule or standard *with a compulsory result*" (*Tango v Tulevech*, 61 NY2d 34, 41 [emphasis supplied]).

To be sure, the decision whether to issue the parole violation warrant was a discretionary one, involving the exercise of reasoned judgment and requiring a choice between two different courses of action, i.e., whether to issue the warrant or not issue it. Indeed, Parole Officer Joseph Maio discussed the matter with his superior, at whose direction the warrant was issued. Once that decision was made, however, execution of the warrant was compulsory; there was no longer any occasion for the exercise of reasoned judgment or the choice between alternative courses of action, i.e., whether or not to execute it. I am not persuaded by the majority's conclusion that in the absence of any statute, regulation or immutable department procedure dictating the method whereby the warrant was to be executed, the method of performance was left to Maio's discretion and hence, not ministerial. Taken to its logical conclusion,

this would prove to be a highly unworkable criterion of an action's character. As for the majority's concern that a contrary determination simply cannot be the law because it would subject State and local municipalities to massive potential liability, even assuming that our determination of this appeal could be legitimately informed by such a consideration, I would not liken the State's responsibility to promptly execute a parole violation warrant for the retaking of a convicted, dangerous felon to the duties of law enforcement agencies in executing arrest and/or search warrants.

In any event, concluding that the State does not enjoy immunity does not end the inquiry, since it remains to be determined whether the State was in fact negligent in the execution of the warrant. Turning, then, to the decision of the Court of Claims, I find its conclusion that the State acted reasonably under the circumstances essentially unsupported by the record. Particularly troublesome are two observations by the court bearing upon its result: "[1] it was reasonable for Mr. Maio to believe that this was not an emergency situation. Mary O'Neill had waited three full days before making her complaint, and [2] once arraigned, Mr. Linderberry had been released by the Cortland City Court on his own recognizance".

With regard to the first statement, City of Cortland Police Officer Daniel Merritt testified that he responded to the contemporaneous 911 call from Linderberry's ex-wife, Mary O'Neill, the morning of March 6, 1992. While it is true that no formal complaint was signed until March 9, 1992, the reasons for the delay are clear and in no way undermine the significance of the underlying event. O'Neill's immediate objective, her personal safety, was accomplished initially with her confinement to the hospital, and prospectively addressed by Linderberry's subsequently breached promise to commit himself to the hospital. Under these circumstances, I would attach no evidentiary significance to the fact that the formal charge was not filed until March 9, 1992. I likewise fail to perceive why the Cortland City Court's bail decision allowing Linderberry to be released on his own recognizance would be relevant to an assessment of the negligence of the State Division of Parole (hereinafter the Division) in performing its duties, particularly in view of its superior knowledge of Linderberry's violent history and manifest deterioration.

Aside from these ill-founded observations, the Court of Claims did not elaborate on the evidentiary basis for its conclusion that the Division acted reasonably under the circum-

stances and, indeed, I can find none. Linderbery's record disclosed a history of random acts of brutality and violence against women, including the rape and kidnaping of three women where a knife, razor and fishing line were used. The Division's case summary noted that the crimes for which he was incarcerated stemmed from two problems: Linderberry's inability to consume alcohol without reverting to violent behavior, and his deviant sexual maladjustment, observing that, "He poses a major threat to females." Among the special conditions imposed upon his release were abstinence from alcoholic beverages and a prohibition against driving a motor vehicle or possessing a driver's license.

Even though the negligent supervision claim is no longer extant, several observations relative to Linderberry's performance on parole are pertinent in view of the Division's claim, accepted by the majority, that its delay was justifiable because he had shown no warning signs of violence or alcohol use, and had positively adjusted to parole. The record discloses that prior to the incident of March 6, 1992, Maio had received complaints from Mary O'Neill that Linderberry was drinking and that she was concerned about her safety. The extent of the Division's investigation into these allegations appears to have been questioning Linderberry and accepting his denials. Despite the special condition prohibiting his operation of a motor vehicle, Maio's earlier progress notes reveal that Linderberry owned a truck and was attempting to apply for a driver's license. Despite being notified on March 10, 1992 of the March 6, 1992 attack, Maio took no action for two days. When he did travel to Cortland on March 12, 1992, his investigation was limited to reviewing the police report and meeting with Linderberry; he did not speak with Merritt or O'Neill concerning the events of March 6, 1992.

Based upon the lack of evidence to support the Court of Claims' determination, I would reverse the judgment entered in favor of the State and remit the case to the Court of Claims for a trial upon the question of damages.

CREW III, YESAWICH JR. and SPAIN, JJ., concur with CARPINELLO, J.; MIKOLL, J. P., dissents in a separate opinion.

Ordered that the judgment is affirmed, without costs.