[741 NYS2d 536]

In the Matter of RICHARD STEVENS (Admitted as RICHARD ZELMA), an Attorney, Respondent. DEPARTMENTAL DISCIPLINARY COMMITTEE FOR THE FIRST JUDICIAL DEPARTMENT, Petitioner.

First Department, May 16, 2002

## APPEARANCES OF COUNSEL

*Andral N. Bratton* of counsel (*Thomas J. Cahill*, attorney), for petitioner.

*Richard Stevens,* respondent pro se.

## OPINION OF THE COURT

Per Curiam.

Respondent, Richard Stevens, was admitted to the practice of law in this Department on July 26, 1982, as Richard Zelma. By an order dated May 23, 2000, this Court granted respondent's petition to change his name on the roll of attorneys and counselors-at-law from Richard Zelma to Richard Stevens. At all times relevant, respondent maintained an office for the practice of law within this Department. Respondent is also admitted in California.

By order dated February 15, 2001, this Court, sua sponte, directed respondent to show cause why we should not vacate our order granting him permission to change his name on the grounds that he recently reverted to his original name in papers filed before this Court in connection with *Matter of the Subpoena of Richard S. Zelma.* That sua sponte motion has been held in abeyance pending the conclusion of this disciplinary proceeding.

By notice and statement of charges served on or about February 26, 2001, and supplemental charges served during the evidentiary hearing, respondent was charged with intentional conversion of $115,000 of a client's funds held in escrow, misrepresentations to a bonding company, gross misuse of his client's escrow account, and intentionally prejudicing his cli-

ent, all in violation of Code of Professional Responsibility DR 1-102 (a) (4) and (7), DR 7-101 (a) (3), and DR 9-102 (a), (b), (d) and (e) (22 NYCRR 1200.3, 1200.32, 1200.46).

By answer dated April 5, 2001, respondent essentially admitted that he wrote checks to "cash" and made ATM transfers on his escrow account, but otherwise denied the allegations. During the evidentiary hearing, respondent did not contest that he commingled funds and failed to maintain proper bookkeeping records of his escrow account.

The Special Referee held hearings on June 21, 25 and 27, 2001, at which respondent appeared pro se. A prehearing stipulation dated April 19, 2001, executed by the Committee and respondent's then counsel, was submitted. The Referee sustained all eight charges against respondent. Following the June 27th hearing on sanction, the Referee reserved decision pending receipt of further written submissions from the parties. On or about July 23, 2001, respondent filed a motion to reopen the hearing. In a report dated August 25, 2001, the Referee denied respondent's motion to reopen and recommended that he be disbarred.

On October 29, 2001, a Hearing Panel convened at which counsel for the Committee appeared; respondent submitted a statement of facts and brief instead. In a report dated November 6, 2001, the Hearing Panel confirmed the Referee's findings of fact and recommendation of disbarment. Respondent's requests for reconsideration on November 15 and 26, 2001 were denied by the Panel in a supplemental report dated November 28, 2001.

All of the allegations of misconduct relate to respondent's representation of the plaintiff Laurie Thompson in connection with proceedings following a nonjury trial in *Thompson v 490 W. End Apts. Corp.*, and the appeal from the 1997 judgment. The trial court had declared, among other things, that Thompson was not the owner of certain "unsold" shares of a cooperative apartment she had been subletting to doctors, and directed her to pay defendant's counsel fees in the sum of $95,000. In December 1996, eight months before entry of judgment, respondent, who knew Thompson from her having notarized documents for him, offered to handle Thompson's appeal if that should become necessary. Thompson testified that respondent stated that she would be his "only" client and he would devote all his energy to the matter.

Thereafter, respondent introduced Thompson to an attorney, who, because of alleged expertise in real estate matters, would

act with respondent as cocounsel. Although there was never a written retainer agreement, Thompson testified that respondent had agreed he would charge $125 an hour. Respondent claimed, in conflict with some documentary evidence, that he agreed to an hourly rate of $300. Throughout 1997, at respondent's direction, Thompson paid him, his cocounsel and his brother, who is also an attorney, at least $142,000 in legal fees, including $92,000 directly to respondent, as well as $4,205.55 for appeal printing costs. Except for the $10,000 paid to his brother, not one payment was made pursuant to a bill or statement; rather, Thompson wrote checks totaling $133,000 in response to respondent's oral requests without him providing an accounting.

Respondent's misconduct arose in connection with a further $115,000 he was holding in escrow on behalf of Thompson, separate from the $142,000 in legal fees. Since the judgment in the sublet matter directed Thompson to pay $95,000 to opposing counsel, she gave respondent an additional $115,000 as collateral for an appeal bond to pay in the event she lost her appeal. Respondent deposited this amount in his bank account designated "Richard Zelma IOLA Account" (escrow account) which already held approximately $50,000 in legal fees already paid by Thompson. Hence, the Referee found, which respondent did not dispute, that he commingled his own money with that of a client in violation of DR 9-102 (a).

By letter dated August 6, 1997, respondent advised the bonding company, Fidelity and Deposit Company of Maryland (Fidelity), that he "was holding $114,000 [sic]" in his escrow account to indemnify Fidelity for any loss incurred in connection with the appeal Bond "up to the amount of $85,000." He also represented that the funds "will not be released to anyone else, including substitute counsel, without first receiving from [Fidelity] written approval to do so." It is undisputed that from August 7, 1997 to August 1998, respondent completely depleted Thompson's money from his escrow account. Even after this Court, by a decision dated July 16, 1998, affirmed the judgment directing Thompson to pay opposing counsel's fees of $95,000 plus interest and costs (*Thompson v 490 W. End Apts. Corp.*, 252 AD2d 430, *lv denied* 92 NY2d 814), respondent proceeded to make cash withdrawals leaving a balance of $45.23 as of August 13, 1998.

Although respondent claimed that Thompson consented to such withdrawals as payment for legal fees owed, Thompson denied such consent. Thompson and her son testified that at

some point, after the fact, respondent admitted to them that he had taken "$40,000" from the escrow account and told them that he could be "imprisoned or disbarred" for such an act. Thompson testified further that she was never told by respondent of any additional depletion of escrow funds, rather, she ultimately learned of it from the bonding company. She also testified that she repeatedly asked respondent for an accounting of legal fees she had already paid to him and his cocounsel. Tellingly, respondent's own letters dated November 10, 1997 and February 6, 1998, which allegedly set forth fees owing, did not credit Thompson for the fees she had already paid to him or any sums he had taken (and was continuing to take) from the escrow account.

Based upon respondent's answer to the charges, the prehearing stipulation, and respondent's statements on the record, the Referee found that the material facts with respect to Charges Two through Eight were admitted and undisputed. The only material fact in dispute was whether, at the times respondent withdrew his client's $115,000 from his escrow account, he had his client's full knowledge and consent or did he intentionally convert client funds in violation of DR 1-102 (a) (4). The Referee credited the testimony of Thompson and her son, together with respondent's own billing letters and records as well as his selected portions of his 1997 and 1998 tax returns, which the Referee found, cast relevant doubt on respondent's general credibility, and found that respondent violated this rule.

As to the bonding company, respondent claimed that he had taken the $115,000 as his "legal fee" with Thompson's consent. However, the Referee found that other than respondent's "totally self-serving uncorroborated and inconsistent statements," there was no evidence of this and concluded that respondent's withdrawal of the $115,000 was "surreptitious." Furthermore, respondent advised Fidelity to look to Thompson to recover the $115,000 (since it was liable for $95,000 plus interest), and respondent "gratuitously and inconsistently offered to assign any outstanding claim he may have against Thompson to Fidelity."

Accordingly, the Referee sustained all eight charges: intentional conversion of client funds in violation of DR 1-102 (a) (4); false representations to the bonding company that he had his client's consent and that he would hold the money to indemnify Fidelity, in further violation of DR 1-102 (a) (4); the sending of self-serving and self-justifying letters to Fidelity at his client's expense thereby intentionally prejudicing or damag-

ing a client in violation of DR 7-101 (a) (3); failing to preserve the identity of his client funds in violation of DR 9-102 (a) and (b); numerous cash and ATM withdrawals from his escrow account in violation of DR 9-102 (e); commingling of his funds with client funds and failure to maintain required bookkeeping records of his escrow account in violation of DR 9-102 (a) and (d); and that respondent engaged in conduct that adversely reflects on his fitness as a lawyer in violation of DR 1-102 (a) (7).

In mitigation, respondent's brother testified to a serious hit-and-run car accident that left respondent in a month-long coma in January 1984 and required a period of physical rehabilitation. However, since respondent worked in a legal capacity since 1985 and there was no suggestion of current incapacity, the Referee found no causal connection between his 1984 accident and his 1997-1998 misconduct. Respondent also offered an affidavit of an attorney attesting to his honest character.

Although the Referee made special accommodations so that respondent's cocounsel could testify on respondent's behalf, he did not show up at the hearing. Rather, respondent attempted to submit his cocounsel's affidavit after the hearing had concluded. While the Referee agreed to keep the hearing open to accept affidavits as to character only, cocounsel's affidavit dealt almost entirely with the merits except for two sentences which purportedly went to character. Further, in his posthearing submission, respondent relied on the affidavit for his proposed findings; and also moved to reopen the record to receive cocounsel's affidavit which had been rejected. Respondent also tried to submit an affidavit from cocounsel to the Hearing Panel. In its supplemental report, the Panel states that it "considered" this affidavit but still declined to reopen the record.

Regarding sanction, the Referee summarized respondent's misconduct noting that he "enriched himself at the expense of his client"; that she was "ultimately required to repay Fidelity out of her pocket for the funds taken by respondent intended to secure Fidelity"; and that not only had respondent falsely claimed he had Thompson's consent to remove the funds, but he also erroneously argued that he did not need such consent. In recommending disbarment as the only appropriate sanction, the Referee found that respondent "violated virtually every provision of the Code of Professional Responsibility pertaining to the proper handling of attorney escrow accounts." Except for

apologizing for his violation of DR 9-102, the Referee determined that respondent expressed no remorse and was "unwilling or unable to acknowledge his responsibility for his actions." Detailing respondent's extensive motion practice before the Referee and this Court, the Referee commented that "respondent has made it an art to avoid or delay having to confront, accept, or recognize the fact that he may have done something wrong." Further, he noted that respondent was previously admonished by the Committee in 1998 for frivolous litigation and failure to recognize his inability to adequately handle such litigation that involved a federal civil rights action in which a $10,000 fine was imposed against respondent pursuant to rule 11 of the Federal Rules of Civil Procedure. The Referee rejected respondent's contention that this admonition should not be considered in light of recent court decisions which justify what he did in the federal case, commenting that respondent "rationalizes his conduct as he has done persistently in this case."

Finding that no "extraordinary mitigation" existed at bar to depart from this Court's policy of disbarring attorneys who intentionally misappropriate funds (*see, e.g., Matter of Tate*, 258 AD2d 120), the Referee specifically "considered and rejected" the alternative of suspension concluding that respondent is "a willful, deceitful and manipulative individual who has shown himself to be unwilling to accept responsibility for his actions, and who seeks to avoid or delay the consequences of his actions." In view of his "pattern of serious professional misconduct the lack of any relevant factors in mitigation, and his inability to recognize the seriousness of his misconduct," the Referee recommended disbarment and further recommended that, pursuant to Judiciary Law § 90 (6-a), respondent be directed to make monetary restitution of $115,000 to Ms. Thompson or, if appropriate, the Lawyers' Fund for Client Protection.

The Hearing Panel considered respondent's 50-page memorandum submitted in lieu of oral argument and unanimously confirmed the Referee's report including the recommendation of disbarment. The Panel's decision notes that, on October 22, 2001 (a week before the hearing before the Panel), respondent filed a motion to "expand the record" to include additional affidavits and other documents, to change the hearing date, and asked the Panel to "disaffirm the findings and or dismiss the charges, and or remand to the matter [*sic*] for a new trial that will be heard by a second referee." The Panel denied this motion.

The Committee now asks this Court to confirm the Hearing Panel's determination confirming the Referee's report, to disbar respondent and to direct that respondent make restitution, pursuant to Judiciary Law § 90 (6-a), in the amount of $115,000 to Ms. Thompson or, if appropriate, the Lawyers' Fund for Client Protection. In support of its petition, the Committee maintains that where, as here, an attorney deliberately misappropriates funds, he is presumptively unfit to practice law (*Matter of Mulrow*, 241 AD2d 7), particularly where mitigation is virtually nonexistent.

By cross motion dated February 22, 2002, respondent raises 14 "points" and asks this Court to, inter alia: (1) deny the Committee's motion to confirm; (2) disaffirm the findings of the Referee and remand for a new referee "requiring independent corroboration"; (3) reverse and/or set aside the Referee's and Hearing Panel's recommendations; (4) enlarge the record to include all exhibits that were excluded by the Referee and that were attached to his motion to reopen; (5) order that the administrative proceedings have not been properly exhausted and, as such the petition is untimely and must be denied; (6) vacate the prior letter of admonition and this Court's sua sponte motion regarding his name change; (7) "exclude any and all further reference" to Ms. Thompson's son; and (8) award respondent costs and attorneys fees expended on his behalf. Every contention raised by respondent was considered and rejected by the Referee and Hearing Panel in their determinations. Respondent's 14 points can be summarized as follows: Thompson and her son were not credible and, in fact, committed perjury, and it was in error for the Referee to exclude his exhibits named "S1 through S41" (which have been provided to this Court for review).

However, contrary to respondent's claims is the fact that the Referee went to great lengths to explain that his credibility determination in favor of Thompson and against respondent was based on more than just the fact that he did not believe respondent's version of events. Indeed, he also relied on the documentary evidence in the record, including respondent's own correspondence and "billing" statements, in construing the issue of credibility against respondent. Moreover, the Hearing Panel made similar findings of credibility by confirming the Referee's report and, the evidence shows that respondent withdrew his client's funds from the escrow account without authority. Nor was there any evidence supporting his defenses that Thompson consented, either explicitly or impliedly, to his

use of the money, that he had an "account stated" and a retaining lien, and that he was entitled to self-help. Thus, a review of the record establishes that there is no reason to disturb these findings.

Nor did the Referee and Hearing Panel err in excluding or not considering further respondent's documents "S1 through S41" some of which he attempted to submit after the close of the Referee's hearing. While exhibit S1 was respondent's answer to Thompson's initial complaint to the Departmental Disciplinary Committee, the remainder of the documents were related to Thompson's appeal or correspondence respondent had sent her. Since they were not material to the central issue of Thompson's knowledge and consent to respondent's conversion, they were "irrelevant," "self-serving" or "unauthenticated," and properly excluded from the record. Furthermore, respondent's assertion that there is insufficient evidence to support a finding that he was guilty of all eight charges is incorrect and illogical where he previously admitted to some of the misconduct charged. Nor is there merit to respondent's assertion that the administrative proceedings have not been exhausted and "may still be pending" because a motion he filed on December 7, 2001 asking the Hearing Panel to reconsider its determination or to remand the case back to the Referee has not yet been decided. Inasmuch as the Panel completed its work with the issuance of its report, reconsideration is not appropriate where the next step is for this Court to review the proceedings (22 NYCRR 605.14 [g]; 605.15 [e]).

A review of respondent's exhaustive and often difficult to understand filings reveals that he is still unaware of the seriousness of his misconduct and believes that he has done nothing wrong. Consequently, in light of respondent's intentional conversion of client funds entrusted to him as an attorney, his pattern of additional misuse of his escrow account, his lack of remorse and any real offer of mitigation and his prior admonition, we impose the sanction of disbarment (*see*, *Matter of Pitts*, 205 AD2d 110; *Matter of Erdheim*, 191 AD2d 105, *lv dismissed* 82 NY2d 916). Furthermore, since there has been a finding of willful misappropriation, respondent is directed to make restitution pursuant to Judiciary Law § 90 (6-a) (a) in the amount of $115,000 to Laurie Thompson (*see*, *Matter of Israel*, 230 AD2d 293).

Accordingly, the Committee's petition to confirm the Hearing Panel's determination confirming the Referee's report in its entirety, to disbar respondent from the practice of law, and to

direct respondent, pursuant to Judiciary Law § 90 (6-a) (a), to make monetary restitution in the amount of $115,000 to his client should be granted. Respondent's cross-motion for, inter alia, disaffirmance of the reports by the Referee and Hearing Panel should be denied and this Court's sua sponte motion to vacate respondent's name change should be withdrawn.

WILLIAMS, P.J., TOM, ANDRIAS, LERNER and SAXE, JJ., concur.

Respondent disbarred, and his name stricken from the roll of attorneys and counselors-at-law in the State of New York, effective the date hereof; respondent directed to make monetary restitution, as indicated; cross-motion granted to the extent of deeming this Court's motion withdrawn.