[842 NYS2d 377]

In the Matter of RICHARD A. ZALK (Admitted as RICHARD ALAN ZALK), an Attorney, Respondent. DEPARTMENTAL DISCIPLINARY COMMITTEE FOR THE FIRST JUDICIAL DEPARTMENT, Petitioner.

First Department, August 23, 2007

## APPEARANCES OF COUNSEL

*Thomas J. Cahill, Chief Counsel, Departmental Disciplinary Committee*, New York City (*Naomi F. Goldstein* of counsel), for petitioner.

*Hinshaw & Culbertson LLP* (*Hal R. Lieberman* and *Richard Supple* of counsel), for respondent.

## OPINION OF THE COURT

Per Curiam.

Respondent Richard A. Zalk was admitted to the practice of law in New York by the First Judicial Department on March 31, 1969. At all times relevant to this proceeding he has maintained an office for the practice of law within the First Judicial Department.

Respondent is a 62-year-old solo practitioner, who had an unblemished disciplinary record after 36 years of practice, until the events at issue here. This proceeding concerns funds taken by respondent from his escrow account for his own use, which, if not for his claim to them, would otherwise belong to the estate of Ruth Gellman, respondent's recently-deceased client.

While there are disagreements about various factual details, the matter turns primarily on a single central legal issue. That issue is, whether the so-called Dead Man's Statute (CPLR 4519) precludes respondent, in this disciplinary context, from relying on his explanation that Ruth Gellman, before her death, gave him the funds remaining in his escrow account from the sale of her property, as payment for 10 years of unpaid legal services.

The Referee, after eight days of hearings, found respondent to be wholly credible, a finding that a review of the record supports, and which we do not disturb here. Based upon the testimony, the basic facts are as follows. Respondent was first retained to represent the estate of Ruth Gellman's father in the

fall of 1970, and from that point on, he began to perform legal services for Ruth Gellman and her husband Arthur, ultimately also becoming a family friend who socialized with them. Over the years, he performed a variety of legal services for them. The nature of their relationship was such that he never issued regular accounts or billing statements setting forth the hours he spent or his standard billing rate; rather, when each matter was concluded, he and the Gellmans would agree upon an appropriate fee.

In 1990 Arthur Gellman died; respondent handled his estate, charging $5,000 for his work. For the next 10 years, he continued performing legal work for Mrs. Gellman, mostly with regard to Hamilton Gardens, a 22-unit garden apartment complex she had inherited from her father. However, knowing that Mrs. Gellman had extremely limited cash resources, respondent explained that he asked for and was paid nothing for his services during this time. Instead, he asserted, during this period, he and Mrs. Gellman had conversations in which they agreed that he would be paid for the work he performed over the years once Hamilton Gardens was sold. That he was paid nothing by Mrs. Gellman since his handling of Arthur Gellman's estate in 1990 is not contradicted, although the Committee questions whether he performed the claimed work for Mrs. Gellman during that period.

In 1998, Mrs. Gellman decided to sell Hamilton Gardens. Respondent handled the entire transaction: he arranged a sale for $2 million, of which $1.4 million was paid by a 15-year purchase-money mortgage calling for monthly payments of $11,258; he persuaded the broker to accept a commission of $80,000 rather than the standard $120,000, and he persuaded the *purchasers* to pay the commission. The $200,000 down payment had been deposited by respondent in an escrow account, and at the time of the closing, after closing costs and adjustments were deducted, the account held $172,151, with additional anticipated future repair costs of approximately $20,000 still to be paid out of the account.

Immediately after the closing on April 5, 2000, respondent went to Mrs. Gellman's home to report on its completion, and to join her in celebrating. Mrs. Gellman's daughter Michelle was present, but testified that she did not sit with respondent and her mother when they spoke, and did not hear the conversation. Respondent says that when he spoke to Mrs. Gellman of the amount she would receive as the balance of the down pay-

ment, she told him that whatever remained after the rest of the expenses were paid would represent his fee for the work he performed over the prior 10 years. Although he protested that she would need that money for taxes, Mrs. Gellman insisted. Respondent also offered as evidence of the conversation a letter he sent to Mrs. Gellman dated April 17, 2000, stating, "While I am enormously touched by your extremely generous offer I cannot accept it. Also please keep in mind that you will have to pay a chunk in capital gains taxes by next April." Respondent says that Mrs. Gellman responded with a phone call insisting that he take the funds.

Soon thereafter, Mrs. Gellman had to be hospitalized, and respondent visited her in the Burke Rehabilitation Hospital in July 2000, where Mrs. Gellman asked him what he was going to do with the money that would be his, once the final costs were paid.

Not long after that, Mrs. Gellman's condition took a turn for the worse, and she died on September 4, 2000. Thereafter, the underlying dispute arose between respondent and the Gellman daughters, Michelle and Jeanne, regarding the funds remaining in respondent's escrow account from the down payment for the Hamilton Gardens sale. While there is disagreement as to the point in time at which the dispute about the escrowed funds arose, it is noteworthy that the daughters nevertheless had respondent continue to represent their mother's estate in the sale of the family home, which closed on September 17, 2001. Respondent was not paid for this work.

On October 14, 2001, Michelle and Jeanne formally challenged respondent's claim to the funds, sending respondent, through an attorney, a letter formally demanding payment of the balance of the escrow funds remaining from the sale of Hamilton Gardens, as well as statements for his professional services regarding the work for which he had previously indicated that he had paid himself $20,000. In fact, respondent had made additional withdrawals from the account since the first $20,000, for a total of $100,000 by the time he received this letter. After receipt of the demand letter, respondent withdrew no more funds from the account, and continues to hold the balance of the escrow fund, approximately $62,000. He has not issued any statements or bills itemizing his work for Mrs. Gellman between 1990 and 2000, nor from the sale of Hamilton Gardens, nor for his services on the Ruth Gellman estate or the sale of the family residence.

Following a letter of complaint from Michelle and Jeanne, in September 2004 the Departmental Disciplinary Committee served respondent with a notice and statement of charges, based upon the claim that respondent had misappropriated client funds when, following the client's death, he took possession of funds remaining in a client's escrow account upon the completion of the transaction from which they derived. His explanation that the client had orally authorized him to take the remainder of the escrow monies as his fee for legal services provided to her over the previous 10 years was viewed by the Committee as irrelevant, inasmuch as it viewed the Dead Man's Statute (CPLR 4519) as precluding him from relying on any such claim.

The specific charges alleged (1) violation of Code of Professional Responsibility DR 1-102 (a) (4) (22 NYCRR 1200.3 [a] [4]), conduct involving dishonesty, fraud, deceit or misrepresentation; (2) misappropriation of funds in violation of DR 9-102 (a) (22 NYCRR 1200.46 [a]); (3) violation of DR 9-102 (b) by withdrawing funds from the escrow account on June 4, 2001 and September 24, 2001, after he was on notice that his right to the monies was disputed; (4) engaging in a conflict of interest by representing the Ruth Gellman estate once his claim to the escrow account was disputed by the coadministrators of the estate; and (5) conduct adversely reflecting on respondent's fitness as a lawyer, in violation of DR 1-102 (a) (7).*

The Committee's position continues to be that application of the Dead Man's Statute (Statute) precludes respondent from relying on his testimony as to the alleged fee arrangement. In the absence of any such supporting testimony, the Committee reasons, respondent's claim that he had a right to those funds must fall, leaving him without a defense to the charges, and rendering his actions in taking possession of the money and failing to turn it over to the daughters a conversion and misappropriation of the money.

The Referee disagreed with the Committee's interpretation of the Statute; he reasoned that while the Statute might bar respondent from testifying about Ruth's statement to him in an action brought by Ruth's estate to recover the amount held in the escrow fund at the time of her death, it would not bar him from offering the testimony in his defense in a disciplinary

---

* The original notice was supplemented by stipulation prior to hearing to add the final two charges.

proceeding. Accordingly, he recommended sustaining only charge five, the allegation that respondent violated DR 1-102 (a) (7) by conduct adversely reflecting on his fitness as a lawyer, based upon his failure to obtain a writing from Mrs. Gellman to confirm their agreement; the Referee remarked that it looks bad when a sick, elderly woman gives a lawyer a significant portion of her assets, and he makes no record of the agreement. He recommended public censure as the appropriate sanction for respondent's nonvenal conduct in regard to the funds taken from the escrow account, citing *Matter of Dalley* (16 AD3d 90 [2005]) and *Matter of Cohen* (12 AD3d 29 [2004]).

The Hearing Panel disagreed, observing that even in this disciplinary context, the requisite elements for the application of CPLR 4519 were all present. It recommended remanding the matter to the Referee for further findings. We agree with the Hearing Panel as to the application of CPLR 4519 on the merits of the charges, but, as both the Committee and respondent agree, a remand would serve no useful purpose. Instead, we decide the matter as follows.

CPLR 4519, headed "Personal transaction or communication between witness and decedent or mentally ill person," provides, in relevant part, that

> "Upon the trial of an action or the hearing upon the merits of a special proceeding, a party or a person interested in the event . . . shall not be examined as a witness in his own behalf or interest . . . against the executor, administrator or survivor of a deceased person or the committee of a mentally ill person. . . concerning a personal transaction or communication between the witness and the deceased person or mentally ill person, except where the executor, administrator, survivor, committee or person so deriving title or interest is examined in his own behalf, or the testimony of the mentally ill person or deceased person is given in evidence, concerning the same transaction or communication."

Therefore, for the statute to apply, the testimony in question must be (1) upon the hearing on the merits of a special proceeding, (2) by a person interested in the event being examined as a witness in his own behalf or interest, (3) against the executor, administrator or survivor of a deceased person, (4) concerning a personal transaction or communication between the witness and the deceased person.

That the hearing in this matter constituted a hearing on the merits of a special proceeding seems apparent, and in any event the Statute was previously held by this Court to apply to such a hearing (*see Matter of Prounis*, 230 AD2d 55, 57 [1997]). That respondent is a person interested in the event, being examined in his own behalf, similarly seems self-evident. His testimony certainly concerned a personal transaction or communication between himself and the deceased person. The only element warranting discussion here is that of whether respondent's testimony is "against" the executor, administrator or survivor of the deceased person.

We conclude that the testimony at issue should be viewed as "against" the Gellman estate; although the estate and the Gellman daughters are not formally parties to this proceeding, respondent's testimony was against their interest inasmuch as they contradict his asserted right to the funds and in effect interpose a competing claim (*see Matter of Prounis*, 230 AD2d at 57; *see generally* Weinstein-Korn-Miller, NY Civ Prac ¶ 4519.18). Moreover, the outcome of the proceeding could certainly affect their rights, since pursuant to Judiciary Law § 90 (6-a) (a), the Court has the authority to require respondent to make monetary restitution to the Gellman daughters (*see Matter of Stevens*, 294 AD2d 1, 7 [2002], *lv denied* 98 NY2d 611 [2002]).

▪ We further observe that the purpose of the statute clearly applies to the present situation. "The purpose of the rule is 'to protect the estate of the deceased from claims of the living who, through their own perjury, could make factual assertions which the decedent could not refute in court' " (*Poslock v Teachers' Retirement Bd. of Teachers' Retirement Sys.*, 88 NY2d 146, 151 [1996], quoting *Matter of Wood*, 52 NY2d 139, 144 [1981]). While the statute by definition prevents accused persons from explaining their apparent misconduct, the statute must be applied notwithstanding that unfairness (*see Matter of Wood, supra*; Hunt, Outside Counsel, *An Overview of the Dead Man's Statute*, NYLJ, Oct. 16, 2006, at 4, 6).

▪ Once it is determined that respondent is precluded from using his testimony to disprove the charges, a preponderance of the evidence establishes that respondent misappropriated and converted $100,000 belonging to the Gellman estate for his own use. Accordingly, in these unique circumstances, his actions in taking the $100,000 after Mrs. Gellman's death require this Court to sustain charge one, for conversion pursuant to DR 1-102 (a) (4), and charge two, for misappropriation pursuant to

DR 9-102 (a). In addition, we confirm the Referee's finding sustaining charge five.

However, we hold that the evidence of respondent's conversation with Mrs. Gellman *is* admissible in the context of determining the nature of the discipline to impose on respondent. That determination, separate and distinct from the hearing on the merits, focused solely on the issue of mitigation, and the Gellman daughters and the estate have no interest in the determination of which measure of discipline is imposed on respondent. Consequently, we conclude that the Dead Man's Statute is inapplicable for this aspect of the proceeding. Notably, this Court's decision in *Matter of Prounis* (230 AD2d at 57), which held that the respondent would be precluded by the Dead Man's Statute from testifying about his oral agreement with his subsequently-deceased client "at any hearing to determine the extent of respondent's misuse of funds he held as a fiduciary," did not deal with the separate and discrete issue of the applicability of the Statute at the penalty phase of the disciplinary proceeding. The dissent's reliance on *Prounis* to justify application of the Statute to the penalty phase of the proceeding is unwarranted.

Respondent's testimony, accepted in mitigation of his misconduct, demonstrates the nonvenality of his taking possession of the funds, with the belief—honest, although mistaken—that he was entitled to them.

While the venal misappropriation of client funds generally results in disbarment (*see Matter of Marks*, 72 AD2d 399, 401 [1980]; *Matter of Ampel*, 208 AD2d 57 [1995]), "[i]n cases where . . . the attorney was mistaken as to his entitlement to his client's funds and there was not motive to convert, this Court has imposed the penalty of suspension rather than disbarment" (*Matter of Glazer*, 218 AD2d 411, 413 [1996], citing *Matter of Klugerman*, 189 AD2d 284 [1993]). In *Matter of Klugerman* (*supra*), the respondent attorney took possession of and used funds payable to clients; finding a valid basis for disagreement between the respondent and his clients with respect to the amount of money due them, it was found that he had acted without venal intent, and a two-year suspension was imposed (189 AD2d at 285). Many other cases discuss situations in which misappropriation of escrowed funds was properly held to be a nonvenal error in judgment (*see e.g. Matter of Dalley*, 16 AD3d 90 [2005], *supra*; *Matter of Cohen*, 12 AD3d 29 [2004], *supra*), and we hold that this is

such a case. Respondent's testimony as to his interactions with the Gellman daughters and Jerry Gilbert, which testimony was found to be credible and which findings we uphold, supports his assertion that his claim to the funds was asserted openly and in good faith (*see Matter of Einhorn*, 88 AD2d 95, 98 [1982].

However, the error is of sufficient magnitude to warrant a suspension, as was imposed in *Klugerman*, rather than the mere censure imposed in the *Dalley*, *Cohen* and *Einhorn* matters. We hold that a two-year suspension is the appropriate sanction in this instance.

While the dissent may disagree as to the proper sanction to impose here, our determination is not a "deviation" from our duty to regulate the conduct of attorneys, but instead, is a careful exercise of that responsibility based upon close consideration of both the law and the facts and circumstances of this matter.

Accordingly, respondent's motion to confirm the Referee's report and disaffirm the Hearing Panel's determination, and the Committee's cross motion to confirm the Hearing Panel's recommendation in part and disaffirm the Referee's report, should both be granted in part and denied in part, in accordance with the foregoing, and the cross motion should be granted to the extent that respondent is suspended from the practice of law in the State of New York for a period of two years.

SWEENY, J. (dissenting).

I am compelled to dissent on a matter of law. Specifically, I disagree with the majority's determination that the Dead Man's Statute (CPLR 4519) does not apply in all phases of a disciplinary proceeding. The history of our Court and the language of the statute dictate otherwise.

The majority correctly applies the statute in addressing the substance of the proceedings, yet inexplicably and, I submit, without foundation, simply rules it does not apply in determining an appropriate sanction. This is not only a misreading of *Matter of Prounis* (230 AD2d 55, 57 [1997]), but a deviation from the Court's inherent duty to regulate the conduct and discipline of attorneys (*see Matter of Wong*, 275 AD2d 1 [2000]; Judiciary Law § 90 [2]).

Accordingly, as respondent's self-serving and otherwise unsupported explanation should not be considered, a more severe sanction should have been imposed.

Saxe, J.P., Friedman, Gonzalez and Catterson, JJ., concur; Sweeny, J., dissents in a separate opinion.

Respondent suspended from the practice of law in the State of New York for a period of two years, effective September 24, 2007.