10 N.Y.3d 669 (2008)
892 N.E.2d 369
862 N.Y.S.2d 305
In the Matter of RICHARD A. ZALK (Admitted as RICHARD ALAN ZALK), an Attorney, Appellant.
DEPARTMENTAL DISCIPLINARY COMMITTEE FOR THE FIRST JUDICIAL DEPARTMENT, Respondent.
Court of Appeals of the State of New York.
Argued April 30, 2008.
Decided June 12, 2008.
*670 Hinshaw & Culbertson, LLP, New York City (Richard Supple and Hal Lieberman of counsel), for appellant.
Alan W. Friedberg, Chief Counsel, Departmental Disciplinary Committee, Supreme Court, Appellate Division, First Judicial Department, New York City (Naomi F. Goldstein of counsel), for *671 respondent.
Chief Judge KAYE and Judges CIPARICK, GRAFFEO, READ, SMITH, PIGOTT and JONES concur in per curiam opinion.

*672 OPINION OF THE COURT
Per Curiam.
This appeal calls upon us to decide whether the Dead Man's Statute (CPLR 4519) applies in an attorney disciplinary proceeding involving how Richard A. Zalk handled a $200,000 down payment in a real estate transaction where he represented the seller, Ruth Gellman, subsequently deceased. For the reasons that follow, we conclude that the Dead Man's Statute does not apply.

I.
Zalk, a sole practitioner specializing in matrimonial, trust and estates, and real estate law, was admitted to the practice of law in New York by the First Department in 1969, and at all relevant times has practiced law within that Department. At the time of the complained-of conduct, he was 62 years old and had an unblemished disciplinary history.
In 1970, Zalk met Ruth Gellman when he represented her father's estate. From that point on, it is undisputed that he performed at least occasional legal work for Ruth Gellman and her husband Arthur. Zalk claims that his professional relationship with the Gellmans blossomed into a close friendship, and that he never sent them regular accounts or billing statements tallying the hours spent or detailing a billing rate. Rather, he asserts, he and the Gellmans would agree upon an appropriate fee at the conclusion of each matter.
Arthur Gellman died in 1990. Zalk represented the estate, for which he charged $5,000. In the fall of 1992, Ruth Gellman suffered a massive heart attack that left her hospitalized for nearly three months and severely compromised her health. By the latter part of the 1990s, she was housebound, mostly confined to bed, and tethered to an oxygen machine.
In the years following Arthur Gellman's death, Zalk performed legal work for Ruth Gellman related to Hamilton Gardens, a 22-unit garden apartment complex that she had inherited from her father. Apparently because he was aware of his client's limited cash resources (Ruth Gellman's yearly gross income from all sources was between $20,000 and $50,000 after her husband's *673 death), Zalk neither billed nor received payment for any of his legal services. Zalk claims that he and Ruth Gellman orally agreed that, in lieu of itemized billings, he would be paid for his legal work for the years from 1990 to 2000 upon the sale of Hamilton Gardens.
The Departmental Disciplinary Committee asserts that this legal work for which Zalk did not bill was minor or insignificant, as Ruth Gellman was involved in no litigation and few, if any, transactions between her husband's death and the sale of Hamilton Gardens, and Zalk was not Gellman's tax attorney. Zalk acknowledges that he has no detailed records of legal work performed for Ruth Gellman during the 1990-2000 time period.
In 1998, Ruth Gellman decided to sell Hamilton Gardens. Zalk represented her for the entire transaction. He arranged the sale for $2 million, of which $1.4 million was paid by a 15-year purchase-money mortgage with $11,258 in monthly payments. According to Zalk, he persuaded the broker to accept a commission of $80,000far below the standard $120,000and he also convinced the purchasers to pay it. Zalk placed the $200,000 down payment in his attorney escrow account.
Immediately after the April 5, 2000 closing, Zalk and Michelle Gellman (one of Ruth Gellman's two daughters) went to Ruth Gellman's house to report the sale's completion and to celebrate with champagne. Zalk claims that he explained the details of the closing to Ruth Gellman and began to calculate the balance, after expenses, of the escrow account in order to write her a check. At this point, according to Zalk, Ruth Gellman told him that
"we both know that I owe you that and a hell of a lot more for everything you've done for me, not just in connection with the sale of Hamilton Gardens but for everything you've done for me since Arthur's death for which you've never billed me ... [W]hat you are going to do is you're going to pay off whatever has to be paid off ... and whatever remains of the downpayment [sic] is going to be your fee for everything you have done for me over the past ten years."
Michelle Gellman testified that she was standing in the hallway outside the door of her mother's room at the time, but "wasn't paying attention," and did not overhear what her mother and Zalk "were talking about, what the details of the conversation were."
*674 Zalk professes that he "was initially reluctant to accept" this offer, and that although he urged Ruth Gellman to retain some of the escrow money to pay capital gains taxes, she insisted the funds were his. In April of 2000 he sent her a letter, a copy of which appears in the record, which states as follows: "While I am enormously touched by your extremely generous offer, I cannot accept it. Also, please keep in mind that you will have to pay a chunk in capital gains taxes by next April." Zalk testified that Ruth Gellman responded to this letter by telephone, telling him "Richard, I don't want to discuss this. This is my decision."
Soon after the putative oral fee agreement, Ruth Gellman was hospitalized. Zalk visited her in the hospital on July 16, 2000, and he says she reaffirmed that he was to keep the balance of the Hamilton Gardens down payment, and joked with him about how he should spend the money. Once again, Michelle Gellman was concededly present. She neither corroborated nor denied Zalk's version of events. A few weeks later, Ruth Gellman's condition took a turn for the worse, and she died on September 4, 2000.
Zalk thereafter represented Ruth Gellman's estate in the sale of the family home. During the course of this work, he corresponded with the Gellman daughters, who had been appointed co-administrators of their late mother's estate when her will could not be located. The family home was ultimately sold in August 2001, with the closing occurring on September 17, 2001.
Eleven days after Ruth Gellman's death, Zalk issued a check made payable to himself in the amount of $20,000 from the money in the Hamilton Gardens escrow account. In January 2001, he withdrew $27,500 more. In April 2001, he withdrew an additional $12,500; in June 2001, another $20,000; and in September 2001, a final $20,000. In 13 months, Zalk therefore appropriated $100,000 from the Hamilton Gardens escrow account for his own use. Of the remaining funds, $10,079 were expended on final open items from the Hamilton Gardens closing and other expenses; at the time of Zalk's hearing, $62,000 remained in the escrow account.
There is disagreement as to when the Gellman daughters first became aware of Zalk's use of the escrow funds, or his claim to the balance from the down payment. But on October 14, 2001which was just over a year after their mother's death and a month after the closing on the family homethe Gellman daughters sent Zalk a letter demanding an accounting for the *675 Hamilton Gardens sale and a check for the balance of monies remaining. The Gellman daughters, as administrators of Ruth Gellman's estate, ultimately filed a complaint with the Committee on February 21, 2003, asking for a determination as to whether Zalk's retention of $162,000 from their mother's estate was appropriate. According to the daughters' letter, Zalk was variously claiming the money as a gift or as legal fees.

II.
On September 27, 2004, after a full investigation, the Committee served Zalk with formal charges. The Committee originally charged Zalk with three charges of misconduct: (charge one) by misappropriating monies in the escrow account, he engaged in conduct involving dishonesty, fraud, deceit, or misrepresentation, in violation of Code of Professional Responsibility DR 1-102 (a) (4) (22 NYCRR 1200.3 [a] [4]); (charge two) by withdrawing from his escrow account, without authorization, $100,000 of the money remaining from the sale of Hamilton Gardens, which money belonged to Ruth Gellman, he misappropriated the funds, in violation of DR 9-102 (a) (22 NYCRR 1200.46 [a]); and (charge three) by withdrawing $20,000 on June 4, 2001, and $20,000 on September 24, 2001, after he was on notice that his right to the money was disputed, he violated DR 9-102 (b) (4) (22 NYCRR 1200.46 [b] [4]). The original charges were supplemented, by stipulation, to include (charge four) engaging in a conflict of interest by representing Ruth Gellman's estate once his claim to the escrow account was disputed, in violation of DR 5-101 (a) (22 NYCRR 1200.20 [a]); and (charge five) conduct adversely reflecting on his fitness as a lawyer, in violation of DR 1-102 (a) (7) (22 NYCRR 1200.3 [a] [7]).
At a disciplinary hearing before a referee, the Committee argued that the Dead Man's Statute (CPLR 4519) precluded Zalk from relying on his conversations with Ruth Gellman to describe their putative fee arrangement. The Dead Man's Statute (CPLR 4519) reads as follows:
"Upon the trial of an action or the hearing upon the merits of a special proceeding, a party or a person interested in the event ... shall not be examined as a witness in his own behalf or interest ... against the executor, administrator or survivor of a deceased person ... concerning a personal transaction *676 or communication between the witness and the deceased person ... except where the executor, administrator, survivor ... or person so deriving title or interest is examined in his own behalf ... concerning the same transaction or communication."
Looking at the "plain language of the statute," the referee reasoned that an attorney disciplinary proceeding was not "against the executor, administrator or survivor of a deceased person." He added that while Zalk "might be barred from testifying in an action brought by the sisters to recover the escrow fund[s]," he "c[ould] not see how, in a disciplinary proceeding, he c[ould] be barred from offering his defense."
As to charges one and two, the referee found Zalk to be "a wholly credible witness" and that "no reason" existed in the record "to doubt that [Zalk] had an oral agreement with [Ruth] Gellman, or at the very least he believes he did"; to "suggest[] that [Zalk] had any wrongful intent"; or to conclude that he "engaged in any dishonesty, fraud, deceit or misrepresentation." Accordingly, the referee recommended that charges one and two be dismissed.
The referee found charge three to be "a closer question," but he ultimately concluded that Zalk "received no clear notice until he received the sisters' letter of October 14, 2001 ... and after that notice he made no further withdrawals." He similarly recommended that charge four would "fall[]" because "there was no apparent `conflict' before the sisters' letter of October 14, 2001 ... and [Zalk] performed no services after that date."
The referee, however, recommended that charge five be sustained, noting that Zalk's "handling of the $200,000 `adversely reflected on his fitness as a lawyer'" because of his "basic mistake ... [of] not obtain[ing] a writing from Mrs. Gellman or other proof confirming their agreement." Additionally, he observed that the "fact remains that it looks awful when a lawyer makes an oral agreement with a sick, elderly woman in which she gives him a significant portion of her assets."
In recommending a sanction, the referee noted that "[t]o call [the Committee's] recommendation [of disbarment] draconian is to understate greatly." In light of Zalk's record of 36 years of practice without any disciplinary problems, his cooperation with the investigation, acknowledged error in not recording the agreement, and positive references (including a Justice of *677 Supreme Court before whom Zalk had appeared some 20 times), the referee recommended a public censure.
The hearing panel of the Appellate Division disagreed with the referee as to the applicability of the Dead Man's Statute, and remanded the matter to him for further proceedings. Specifically, the panel thought the referee "erred" when he ruled that the disciplinary proceeding against Zalk was not "`against the executor, administrator or survivor' of Mrs. Gellman." In this regard, the panel opined that the referee should have
"take[n] into account that pursuant to Judiciary Law § 90 (6-a) (a), the court may require [Zalk] to make monetary restitution to the Gellman daughters. If [Zalk's] testimony concerning the fee conversation were admissible and found to be persuasive, the outcome [in the disciplinary proceeding] would disserve the interest and adversely affect the rights of the daughters in that [Zalk] would not be ordered to return to Ruth Gellman's estate the money he claims as his own" (citations omitted).
As a result, the panel found that Zalk's testimony was "`against' the Gellman daughters within the meaning of" the Dead Man's Statute.
Zalk moved to confirm the findings of fact and conclusions of law in the referee's report, accept the recommended sanction of public censure, and disaffirm the hearing panel's report and recommendation. The Committee cross-moved to dismiss Zalk's motion; affirm the hearing panel's conclusion of law and disaffirm its remand to the referee; have the court review the record de novo; and upon review, disbar Zalk or, in the alternative, sanction him as it deemed appropriate.
In a per curiam opinion, the Appellate Division, with one Justice dissenting, granted the motion and cross motion to the extent of disaffirming the referee's and the hearing panel's conclusions of law with respect to CPLR 4519, and disaffirming their recommendations; and, upon review of the record de novo, found that Zalk had engaged in professional misconduct in violation of DR 1-102 (a) (4) (conversion), DR 9-102 (a) (misappropriation) and DR 1-102 (a) (7) (conduct adversely reflecting on his fitness as a lawyer). The Court suspended Zalk from the practice of law for two years.
The Appellate Division concluded that the Dead Man's Statute "precluded [Zalk] from using his testimony to disprove the *678 charges," noting that "the outcome of the proceeding could certainly affect [the Gellman daughters'] rights, since pursuant to Judiciary Law § 90 (6-a) (a), the Court has the authority to require [Zalk] to make monetary restitution to [them]" (Matter of Zalk, 45 AD3d 42, 48 [1st Dept 2007]). The Appellate Division also decided, however, that Zalk's testimony about his fee arrangement with Ruth Gellman was admissible as to sanction because "the Gellman daughters and the estate have no interest in the determination of which measure of discipline is imposed on [Zalk]" (id. at 49). Further, "[Zalk]'s testimony, accepted in mitigation of his misconduct, demonstrates the nonvenality of his taking possession of the funds, with the belief honest, although mistakenthat he was entitled to them" (id.). By contrast, the dissenting Justice, who thought the Dead Man's Statute applicable to all phases of the disciplinary proceeding, would have imposed a more severe sanction.
A Judge of this Court granted Zalk's request for an interim stay of the suspension order pending his motions for leave to appeal and for a stay pending disposition of that appeal. We subsequently granted Zalk leave to appeal and a stay, and now reverse.

III.
"The rule of evidence popularly referred to as the Dead Man's Statute" was enacted by the New York Legislature in 1851, and is
"widely considered to be the last vestige of the common-law rule which made all interested persons and parties incompetent to testify. After the general rule barring testimony from interested persons was abolished, a new rule was adopted to prevent the living from testifying to certain `personal transactions' with the dead. One of the main purposes of the rule was to protect the estate of the deceased from claims of the living who, through their own perjury, could make factual assertions which the decedent could not refute in court" (Matter of Wood, 52 NY2d 139, 143-144 [1981] [citations omitted]).
As we pointed out in Wood, "[w]hile the utility and wisdom of the rule have been often questioned throughout its history and the Legislature has often forcefully been urged to change or to modify the statute, it, nonetheless, has been consistently reenacted *679 by the Legislature and remains a part of the law of this State" (id. at 144 [citations omitted]).
We therefore look to the language of section 4519, and reach the same conclusion as did the referee: although Zalk "testified `as a witness in his own behalf or interest,' ... he did not testify `against the executor, administrator or survivor' of Mrs. Gellman. Rather, he testified against the Disciplinary Committee, which is none of these latter."
The Committee counters that a decision in the disciplinary proceeding recognizing Zalk's entitlement to the disputed funds would compromise the administrators' chances of reimbursement from the Lawyers' Fund for Client Protection (see 22 NYCRR 7200.10 [d] [in determining eligibility of a claim against the Fund, "(a) certified copy of an order disciplining an attorney for the same act of conduct alleged in a claim, or a final judgment imposing civil or criminal liability therefor, shall ... be evidence that the attorney committed such act"]). Such a decision would also cut off the opportunity for the administrators to invoke the doctrine of collateral estoppel in a civil suit against Zalk.[*]
In essence, the Committee takes the position that, although the Gellman daughters are not parties to the disciplinary proceeding, the rules of the Fund and the doctrine of collateral estoppel endow them with a vital interest in a finding that Zalk converted estate monies. But the Dead Man's Statute only applies to testimony "against the executor, administrator or survivor" of the deceased. It does not foreclose testimony that potentially cuts against these parties' interests in a contingent future proceeding.
Accordingly, the order of the Appellate Division should be reversed, with costs, and the matter remitted to that court for further proceedings in accordance with this opinion.
Order reversed, etc.
NOTES
[*] On this appeal, the Committee does not discuss Judiciary Law § 90 (6-a) (a), which figured in the decisions of both the panel and the Appellate Division. This is apparently because restitution was not sought in this case (see 22 NYCRR 605.12 [b] [2] [if Committee intends to "seek restitution or reimbursement pursuant to section 90 (6-a) (a) of the Judiciary Law," this is to be "set forth" in notice of charges]).